Scott A. GROOM, Appellant,

v.

STATE of Alaska, DEPARTMENT OF TRANSPORTATION, Appellee.

No. S–11882.

Supreme Court of Alaska.

Oct. 26, 2007.

---

**16.** Maj. at 619, 620–22.

**17.** Alaska Const. art. I, § 22.

James M. Hackett, Law Office of James M. Hackett, Fairbanks, for Appellant.

Rebecca H. Cain, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

BRYNER, Chief Justice.

## I. INTRODUCTION

In 1999 the Alaska Workers' Compensation Board concluded that Scott Groom had injured himself in a slip-and-fall incident at

work. In 2003 the board reversed course and determined that Groom had not been involved in a slip-and-fall incident. After finding that Groom's work duties required neither heavy lifting nor episodes of prolonged standing and that Groom had not been required to engage in heavy or extended snow shoveling, the board denied Groom's claims for various disability and impairment benefits. We reverse the board's 2003 resolution of Groom's slip-and-fall claims because the board failed to give Groom any notice that it might revisit its 1999 determination that he had sustained an injury in the course and scope of his employment with the state. We also reverse the board's dismissal of Groom's remaining claims because the board applied the incorrect legal standard in finding that the state had rebutted the presumption of compensability. We remand this case for further proceedings.

## II. FACTS AND PROCEEDINGS

Scott Groom suffers from a condition known as congenital lymphedema, or Milroy's disease. Congenital lymphedema is a genetic disorder of the lymphatic system and is quite rare. Vessels in the lymphatic system circulate lymph and other interstitial fluids throughout the body; Groom is missing a number of these vessels, and, as a result, his arms and legs frequently swell with uncirculated fluid. In their swollen state, Groom's legs are spongy. Lymphatic vessels also transport bacteria and other hostile agents to lymph nodes, allowing the body to produce antibodies; because Groom's body or lymphatic system cannot perform this function reliably, he is prone to cellulitis, a type of local skin infection.

Groom worked for the Department of Transportation as a weigh station operator. On March 13, 1999, after letting his supervisor know that he had injured himself in a fall, Groom left the Fox weigh station near Fairbanks and never again returned to work. Soon after, he completed a report of occupational injury in which he alleged that he had fallen on the ice, creating a "rip in [his] left leg." In the employer section, Groom's supervisor wrote, "Scott told me that he fell

measuring a[n] Alaska West Express 3S1S1 Axle Spread ... on a trailer."

The state twice controverted Groom's report of injury. In its second controversion the state declared that Groom could not have fallen while inspecting an Alaska West Express truck because, according to an investigation by the state, the measurement allegedly taken by Groom on March 13 "did not take place."

Groom then filed an application for adjustment of claim with the Alaska Workers' Compensation Board. In that application he stated that he ripped open his left calf at work by slipping and falling while measuring an Alaska West Express "bulker" truck at the Fox weigh station. He requested temporary total disability and permanent partial impairment benefits, as well as costs and penalties.

The board held a hearing on Groom's claim on August 5, 1999. At the request of the state, the board considered only one issue—whether Groom ripped his left calf open on March 13, 1999 in a slip-and-fall accident at the Fox weigh station. The board heard testimony from Groom, Groom's mother, and Groom's supervisor. Groom testified:

I walked around to the back of th[e] truck, I slipped with my left leg and went down Indian style—my right knee came down [on] my left calf [and] popped it like a big [ ] zi[t].

Groom's mother testified that when she saw Groom's leg, it looked as though it had "crack[ed] open like a watermelon that is too ripe." Both she and Groom described the injury as unusually severe. Groom admitted that he did not initially seek medical attention for the injury.

Groom's supervisor testified that Groom could not have fallen while inspecting an Alaska West bulker truck on March 13, because Alaska West had not shipped any bulkers in a 3S1S1 configuration on that day. He also noted that the computer system had no record of a truck, bulker or otherwise, being inspected near the time Groom claimed to have fallen.

In response Groom denied ever claiming that the truck he was inspecting was a bulk-

er. He also argued that the absence of a computer record could be readily explained: after he fell, he immediately allowed the truck he was inspecting to leave. Rather than record an incomplete inspection, he deleted the log entry.

The state also submitted the deposition of Andrew Holland, a physician's assistant at Tanana Valley Clinic. Holland was the first health care provider Groom saw following his injury. Holland testified that he diagnosed Groom with cellulitis because of patchy red skin. His chart notes did not show a laceration, and he said that he would normally note the presence of a laceration if he observed one. He also observed swelling in Groom's legs.

The board handed down its decision on October 14, 1999. It found that the state had produced substantial evidence to overcome the presumption of compensability and had shifted the burden to Groom to prove his claim by a preponderance of the evidence. It found that Groom had met this burden and declared that Groom's claim for workers' compensation benefits associated with his March 13, 1999 injury was compensable.

In reaching this conclusion the board found: (1) Groom and his mother were generally credible witnesses; (2) an on-going personnel dispute explained why Groom removed the computer evidence: because he did not wish to document his failure to weigh and measure trucks, as required by his employer; and (3) the absence of contemporaneous medical treatment was explained by Groom's difficulty in finding knowledgeable medical providers for his disease and his consequent history of self treatment. The board made one additional finding:

> Significantly, ... though we were not asked to decide this issue, we also believe the associated "flare up" was a temporary aggravation of a preexisting condition and that entitlement to benefits ended upon resolution of the condition.

The state petitioned the board to reconsider its decision; the board declined. The state then appealed to the superior court.

About a month after the 1999 board decision, Groom filed a second report of occupational injury. He claimed a different type of injury, centering on his snow shoveling duties the previous winter. He stated that he had been "forced to work the Ester Scale with no snow blower, just a shovel causing constant tears & damage to both legs." The state controverted the report by arguing that Groom failed to provide written notice of the injury within thirty days, as required by AS 23.30.100, and that there was no medical documentation linking Groom's current condition to his work with the state.

Because the parties had agreed to address only one aspect of Groom's slip-and-fall claim at the board's initial hearing on that claim, they continued to develop other aspects of their cases during the superior court appeal. The state arranged for an independent medical examination of Groom by Dr. Andrzej Szuba on March 3, 2000. Dr. Szuba stated that Groom's cellulitis in 1999 could have been caused by trauma even in the absence of a visible laceration; he concluded that Groom's work for the state was a substantial factor in exacerbating Groom's lymphedema. Shortly after Dr. Szuba wrote his report, Groom filed another application for adjustment of claim under the slip-and-fall case number, seeking permanent total disability and permanent partial impairment benefits, as well as penalties and interest. He claimed that the state's controversions had been unfair or frivolous and reported that the slip and fall had caused "cellulitis, swelling, infection and fever, [and an] increase in production of lymphatic fluid."

The state's answer characterized Groom's application as an amendment to his original claim. It agreed that Groom could amend his claim to include an award of additional benefits because the scope of the 1999 hearing did not include a determination of the benefits to which Groom was entitled. But it denied that Groom could allege a different type of injury from that addressed in the August 5, 1999 hearing, contending that the new allegation would interfere with the superior court's jurisdiction or constitute an impermissible attempt to relitigate issues that the board had already decided. It also denied that Groom's employment was a sub-

stantial factor in bringing about any change in his lymphedema.

Groom then filed an affidavit of readiness for hearing. The state opposed it, claiming that it needed to conduct additional discovery about the nature, scope, and physical demands of Groom's work, as well as medical stability and total disability. The board scheduled a hearing for November 21, 2000. The state deposed Dr. Szuba before the hearing. In his deposition Dr. Szuba testified that an injury to Groom's leg on March 13, 1999 could aggravate his lymphedema by increasing swelling; he further testified that every cellulitis infection damages the lymphatic system. Dr. Szuba also said that cellulitis could develop even without an "objective tear" in the skin because of blunt trauma or an increased workload or swelling. Dr. Szuba's impression was that Groom's condition had changed significantly from the year before. Dr. Szuba indicated that if Groom's work did not involve prolonged standing or very much snow shoveling, then he would have to reconsider his conclusion that Groom's work had been a substantial factor in aggravating his lymphedema. Dr. Szuba gave his opinion that Groom was not medically stable and might benefit from specialized treatment.

Following Dr. Szuba's deposition, Groom filed a second revision of his slip-and-fall claim. In it, he requested temporary total disability benefits from March 13, 1999 onward because of Dr. Szuba's testimony that he was not yet medically stable. The parties agreed to postpone the scheduled hearing so that the state could respond to Groom's latest claim. When the state filed its answer, it admitted that Dr. Szuba said that Groom was not medically stable but denied that Groom's work for the state entitled him to receive temporary total disability and medical benefits.

On January 4, 2001, the superior court upheld the 1999 board decision, deciding that the board's findings were supported by substantial evidence. It also found that the board had not violated the state's due process rights by considering an alternative injury theory when it discussed the "flare up" of Groom's lymphedema.

The parties then set another hearing date, June 14, 2001, on Groom's claim. On March 5, 2001, Groom filed his fourth workers' compensation claim, asserting that the superior court's decision established the law of the case; he again requested temporary total disability and permanent total disability benefits, as well as penalties and interest. The state answered this claim by asserting that the law of the case included not only the fact that the slip and fall had occurred but also the limited nature of the flare up. It denied that it should pay benefits based on Dr. Szuba's written reports because its investigation showed that Groom's work duties were not as he described them. It renewed its defense that Groom's second report of injury—centering on his snow-shoveling duties—was not timely and raised the additional defense that the snow-shoveling claim had not been filed within the two-year statute of limitations.

On March 9, 2001, Groom filed his fifth workers' compensation claim using the slip-and-fall case number. This claim encompassed both the slip and fall and the injury report related to snow shoveling. It gave the following description of his injuries:

> [C]ontinuous aggravation, triggered by injury, injured left leg at work by slipping & falling; while this act was the culminating event, employer aggravated employee's lymphedema by requiring *standing* and *shoveling* prior.

Groom reported that this claim was needed "to make [his] application consistent with facts adduced through discovery and medical examinations." The state answered the March 9, 2001 claim by asserting that any claim for permanent aggravation of his lymphedema should have been filed under the case number that the board assigned to the snow-shoveling report of injury and that his claims related to the snow shoveling or standing were barred either because of late notice of the injury or because of the statute of limitations.

Groom filed a final workers' compensation request on May 10, 2001. In this claim he asserted that the nature of his injury was "incremental injuries over time, culminating

in left leg injury." He asserted that if Dr. Szuba's reports did not establish permanent total disability, then they established temporary partial disability; Groom then added a request for temporary partial disability benefits to his claim.

At a June 1, 2001 prehearing conference, the board joined Groom's two injury claims— the slip-and-fall and the shoveling-and-standing injury—because discovery had been conducted as to both injuries after the board's 1999 decision.

The board held a second hearing on August 16, 2001. Five witnesses testified in person for Groom: (1) Groom; (2) his mother; (3) a friend, who testified that Groom likely had to shovel a substantial amount of snow; (4) a DOT supervisor, who provided information about the state's vehicle inspection processes; and (5) a commercial vehicle enforcement officer, who provided information about inspections and snow-shoveling duties around the weigh. station. Two witnesses testified for the state: (1) another weigh station operator, who testified that snow shoveling was light duty and inspections were short and required little standing; and (2) Groom's supervisor, who testified about office procedures and the lack of snow in Fairbanks during the 1999 winter. Groom's treating physician, Dr. Bartling, testified by deposition. The board left the record open at the end of the August 16 hearing. The state stipulated to payment of temporary total disability compensation until the board reached a decision in the case.

The board reconvened on June 13, 2002 to receive Dr. Szuba's testimony. Dr. Szuba testified that his deposition testimony in 2000 had focused on Groom's description of his work as involving prolonged standing and heavy work shoveling snow, as well as on the fact that Groom did not have proper medical garments to control his lymphedema. Dr. Szuba then stated that there are no medical guidelines for the length of time someone with lymphedema should stand; some patients with lymphedema will experience swelling within as little as fifteen minutes of standing, while others can tolerate longer periods of standing. Dr. Szuba reiterated his testimony that Groom's March 1999 cellu-

litis damaged his lymphatic system, but the damage would be limited to his left leg. He stated that if he assumed on a hypothetical basis that Groom's work activities were much lighter than he described, he would not conclude that Groom's work was a substantial factor in aggravating his lymphedema. He also testified, however, that vehicle inspections as described by Groom's co-worker would be sufficient to cause an increase in swelling and that standing and shoveling would worsen Groom's condition regardless of the frequency with which he did them. Ultimately, Dr. Szuba reaffirmed his deposition testimony that Groom's work was a substantial factor in bringing about the need for medical treatment and Groom's disability.

The board issued an interlocutory decision on July 25, 2002. It concluded that Groom had misrepresented his work conditions. The board found that Groom's lack of credibility was "uniquely troubling" because it undercut the usefulness of the medical opinions offered by Drs. Szuba and Bartling. The board ordered Groom to undergo a second independent medical evaluation because the board found that the medical opinions were inconsistent, making it difficult to determine whether Groom was medically stable or permanently totally disabled. The board further directed that the second-evaluation physician be requested not to rely on Groom's assertions about his work. It also ordered that the second-evaluation physician be given copies of the interlocutory order and the 2001 hearing transcript.

In a petition for reconsideration Groom argued that the board could not fairly rely on the board's earlier findings beyond the conclusion of compensability because "the nature or type of Groom's disability was not an issue to be decided by the [first] Board." Groom argued that adopting any other part of the board's original dicta would deny him due process of law. He also requested that the board provide the second-evaluation physician with a transcript of the 1999 hearing. The board denied reconsideration, emphasizing that no transcript was needed because its 1999 decision and the superior court order affirming it were "long[ ]since final."

The board selected Dr. Neil Pitzer to evaluate Groom for the second independent medical evaluation. It posed a number of questions to Dr. Pitzer. Most of the questions assumed that the March 13, 1999 slip-and-fall accident happened and asked Dr. Pitzer his opinion of the effect of the slip and fall on Groom's condition. Dr. Pitzer examined Groom on December 5, 2002. In his report Dr. Pitzer concluded that: (1) the March 13, 1999 injury aggravated or combined with Groom's preexisting lymphedema to produce the need for medical treatment or disability; (2) Groom was medically stable; and (3) Groom had a six percent whole person impairment related to his March 13, 1999 injury.

On May 8, 2003, the board held its fourth hearing on Groom's claims. Dr. Pitzer testified by deposition. The board also heard testimony from Groom again and from two final witnesses and closed the record. It issued its final decision on May 30, 2003.

The board decision focused on Groom's claim for permanent total disability benefits. It began by noting that Groom had made a prima facie case for such benefits and was entitled to the presumption of compensability under AS 23.30.120(a).[1] It next determined that the presumption was overcome by the substantial evidence provided by the second-evaluation physician, Dr. Pitzer, that Groom was able to return to employment in positions that did not require significant physical effort or exposure to contusions or other physical stress and that he did not suffer permanent and total work-related disability. As a result, Groom was required to prove his case by a preponderance of the evidence.

The board then revisited its 1999 finding that Groom had injured himself at work on March 13, 1999. It stated:

Based on the slender record available to us at the time of the August 5, 1999 hearing, we gave credence to the employee in our October 14, 1999 and November 19, 1999 decisions. Those decisions, and the Superior Court affirmation of those decisions, are now final and the employee's entitlement to the brief period of [temporary total disability] benefits awarded in those decisions, from March 13, 1999 through March 31, 1999, is now final. Nevertheless, based on the evidence fully developed in the present record, we find the employee's testimony is patently incredible. We now find his explanation of the disappearance of the employer's computer records concerning the truck he asserts is involved in his March 13, 1999 trip and fall claim is not credible. We are unable to give any weight to his uncorroborated history of that accident. We also find the subsequent medical records, especially those of P.A.C. Holland, are persuasive that the employee did not suffer a significant open wound at the time that he claimed. Based on the preponderance of the total evidence in the present record, we find the employee did not suffer his claimed injury at work on March 13, 1999.

(Citations omitted.)

The board also found that Groom's misrepresentations entirely undercut the utility of all expert testimony in his case; it stated, "[W]e can give no weight to the substantive opinions of the[ ] physicians regarding the work-relatedness of this employee's lymphedema." It then went on to rely on testimony from Drs. Szuba and Pitzer to decide that Groom's lymphedema was not substantially aggravated by his work for the state. It denied his claim for permanent total disability benefits. It then denied the rest of Groom's claims because it had determined that he did not injure himself or substantially

---

1. AS 23.30.120, "Presumptions," provides, in relevant part:
    (a) In a proceeding for the enforcement of a claim for compensation under this chapter it is presumed, in the absence of substantial evidence to the contrary, that
       (1) the claim comes within the provisions of this chapter;
       (2) sufficient notice of the claim has been given;
       (3) the injury was not proximately caused by the intoxication of the injured employee or proximately caused by the employee being under the influence of drugs unless the drugs were taken as prescribed by the employee's physician;
       (4) the injury was not occasioned by the wilful intention of the injured employee to injure or kill self or another.

aggravate his lymphedema in the course and scope of his work. Finally, the board decided that the statute of limitations issue was moot.

Chairman Walters dissented from the board's opinion. Like the board, he would have found that Groom was incredible, had not suffered a slip-and-fall injury, and was not entitled to permanent total disability benefits. Unlike the board, Chairman Walters would, given "the near vacuum of reliable medical evidence," have relied on Dr. Pitzer's opinion to award Groom permanent partial impairment benefits for a six percent whole person impairment and temporary total disability benefits from March 13, 1999 through July 30, 1999, as well as medical benefits related to the aggravation.

Groom appealed the board's decision to the superior court. He argued, among other things, that: (1) his claims were not barred by the statute of limitations; (2) the doctrine of issue preclusion should have prevented the 2003 board from reversing the final and binding decision of the 1999 board; (3) the 2003 board erred in applying collateral estoppel to the 1999 board's dicta that Groom's lymphedema aggravation was temporary; (4) the 2003 board erroneously deprived Groom of the presumption of continuing disability and further erred in fashioning its own medical opinions; and (5) the board's decision was not supported by substantial evidence. The state responded that the board's decision was correct and that Groom's issue-preclusion argument was meritless; it also reiterated its argument that Groom's standing and shoveling claims were barred by the statute of limitations.

At oral argument in the superior court, the state raised for the first time the argument that issue preclusion could not apply to the 2001–2003 board proceedings because they were a modification under AS 23.30.130. The superior court ordered supplemental briefing on this issue. In his briefing on the modification issue, Groom argued that if the later proceeding was a modification, then the board had denied him due process by not giving him notice of the issues it intended to

examine. He also alleged that he was prejudiced by the lack of notice because he could have produced additional corroborating evidence to support his claims of the 1999 injury.

The superior court affirmed the board's decision. It decided that res judicata did not apply, because the 2003 decision was based on new claims Groom filed in 2001, including his claims that standing and shoveling aggravated his lymphedema and increased his disability. It further ruled that even if the case involved a modification, it fell within the board's power to modify its decisions. The superior court also ruled that the board had provided sufficient legal justification to reopen the case, but it did not address Groom's due process claims. The superior court went on to conclude that the state had provided sufficient evidence to rebut the presumption of compensability and that the board's findings were supported by substantial evidence. The superior court declined to rule on the statute of limitations question because the board had not addressed it.

Groom petitioned for rehearing. The superior court denied the petition. Groom appeals.

## III. DISCUSSION

Groom urges us to reverse the board's 2003 decision and award him a variety of benefits. He argues that the 2003 decision was an impermissible modification of the 1999 board order. He further argues that the 2003 decision was flawed both because the state failed to rebut the presumption of compensability and because the board fashioned its own medical opinions. The state contests each assertion and additionally argues that Groom's snow shoveling and prolonged standing claims are barred by the statute of limitations.

### A. Standards of Review

When the superior court acts as the intermediate court of appeal in an administrative matter, we independently review and directly scrutinize the merits of the administrative board's decision.[2] We review the

2. *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000); *Tesoro Alaska Petroleum Co. v. Kenai*

board's factual findings under a substantial evidence standard.[3] Under this standard, we will uphold the board's findings so long as they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[4]

We review questions of law not involving agency expertise de novo, substituting our own judgment for the board's.[5] We will adopt rules of law "most persuasive in light of precedent, reason, and policy."[6]

## B. Inadequate Notice

Groom argues that the board's 2003 decision violated AS 23.30.130[7] by modifying the board's 1999 board decision. He alleges that the board failed to provide him with adequate notice in 2003 of its intent to revisit its 1999 findings concerning the original slip-

and-fall claim and that in modifying the 1999 decision, the 2003 decision failed to "indicate how the 1999 Board decisions were mistaken."

Groom argues that the board was bound to follow the procedures set out in AS 23.30.110[8] and its own regulations for notice and identification of issues. Groom notes that we have previously reversed the board for failing to provide notice that it intended to revisit a factual finding, and he cites our decision in *Dresser Industries v. Hiestand*.[9] In response the state argues that Groom's notice arguments are meritless because Groom himself asserted that he could seek additional benefits for the March 13, 1999 slip and fall and that "Groom cannot seriously argue that he was surprised by the

*Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987).

3. *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1231 (Alaska 2003).

4. *Grove v. Alaska Constr. & Erectors*, 948 P.2d 454, 456 (Alaska 1997) (quoting *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1046 (Alaska 1978)).

5. *Id.*

6. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

7. AS 23.30.130, "Modification of awards," provides:

    (a) Upon its own initiative, or upon the application of any party in interest on the ground of a change in conditions, including, for the purposes of AS 23.30.175, a change in residence, or because of a mistake in its determination of a fact, the board may, before one year after the date of the last payment of compensation benefits under AS 23.30.180, 23.30.185, 23.30.190, 23.30.200, or 23.30.215, whether or not a compensation order has been issued, or before one year after the rejection of a claim, review a compensation case under the procedure prescribed in respect of claims in AS 23.30.110. Under AS 23.30.110 the board may issue a new compensation order which terminates, continues, reinstates, increases, or decreases the compensation, or award compensation.
    (b) A new order does not affect compensation previously paid, except that an award increasing the compensation rate may be made effective from the date of the injury, and if part of the compensation due or to become due is unpaid, an award decreasing the compensation rate may be made effective from the date of the injury, and payment made earlier in excess of the decreased rate shall be deducted from the

unpaid compensation, in the manner the board determines.

8. AS 23.30.110, "Procedure on claims," provides, in relevant part:

    (c) Before a hearing is scheduled, the party seeking a hearing shall file a request for a hearing together with an affidavit stating that the party has completed necessary discovery, obtained necessary evidence, and is prepared for the hearing. An opposing party shall have 10 days after the hearing request is filed to file a response. If a party opposes the hearing request, the board or a board designee shall within 30 days of the filing of the opposition conduct a pre-hearing conference and set a hearing date. If opposition is not filed, a hearing shall be scheduled no later than 60 days after the receipt of the hearing request. The board shall give each party at least 10 days' notice of the hearing, either personally or by certified mail. After a hearing has been scheduled, the parties may not stipulate to change the hearing date or to cancel, postpone, or continue the hearing, except for good cause as determined by the board. After completion of the hearing the board shall close the hearing record. If a settlement agreement is reached by the parties less than 14 days before the hearing, the parties shall appear at the time of the scheduled hearing to state the terms of the settlement agreement. Within 30 days after the hearing record closes, the board shall file its decision. If the employer controverts a claim on a board-prescribed controversion notice and the employee does not request a hearing within two years following the filing of the controversion notice, the claim is denied.

9. *Dresser Indus., Inc./Atlas Div. v. Hiestand*, 702 P.2d 244 (Alaska 1985).

Board's review of the facts on which [its] earlier decision [had been] based."

We have previously held that the crux of due process is the opportunity to be heard and the right to adequately represent one's interests.[10] While the actual content of the notice is not dispositive in administrative proceedings, the parties must have adequate notice so that they can prepare their cases: "[t]he question is whether the complaining party had sufficient notice and information to understand the nature of the proceedings."[11] We have also held that defects in administrative notice may be cured by other evidence that the parties knew what the proceedings would entail.[12]

Based on the record in this case, we hold that the board did not give Groom adequate notice that it would revisit its earlier factual finding that he had sustained a compensable injury on March 13, 1999. In reaching this conclusion we look at the notices the board gave the parties concerning its upcoming hearings, the parties' pleadings, and other written material the board produced relating to the claim, such as its interlocutory orders and its letter to the second-evaluation physician.[13]

The Alaska Workers' Compensation Board gives notice to parties of the issues to be addressed at a hearing through prehearing conference summaries.[14] By regulation, a prehearing summary governs the issues and course of the hearing absent a finding of extenuating circumstances.[15] In this case, the board never identified reconsideration of its prior decision that Groom had in fact suffered a compensable injury in March 1999 as an issue it might consider at a hearing. The state never requested in any of its pleadings that the board reconsider the issue either.[16] In fact, the state affirmatively represented that it did not contest that Groom had suffered a slip and fall in March 1999. For example, in closing argument in 2003, counsel for the state said that "it is true that we're no longer arguing that Mr. Groom did not slip and fall on March 13th, because that was found by the board to be the case."[17] The state also never argued that the board should reexamine its decision that the slip and fall happened in its briefing before the board. Before the final hearing in May 2003, the state asked the board to dismiss Groom's claims related to standing, shoveling, and other general work duties, so that the only remaining issue would be "whether the compensable March 1999 cellulitis infection ('flare-up') entitled the Employee to more benefits th[a]n those originally paid or conceded by the Employer."

All of the evidence in the record suggests that the parties and the board alike considered the question of Groom's fall to be settled by the law of the case. When the board denied Groom's request that the second-evaluation physician be provided with a copy of the 1999 hearing transcript, it did so because that decision was "long[ ]since final." Both parties referred to the previous superior court decision as the law of the case. The law of the case doctrine "maintains that issues previously adjudicated can only be reconsidered where there exist 'exceptional circumstances' presenting a 'clear error constituting a manifest injustice.' "[18] Even if

---

10.  *Matanuska Maid, Inc. v. State*, 620 P.2d 182, 192 (Alaska 1980).

11.  *North State Tel. Co. v. Alaska Pub. Util. Comm'n*, 522 P.2d 711, 714 (Alaska 1974).

12.  *Id.*

13.  *See Dresser*, 702 P.2d at 247. Although *Dresser* involved a modification, the board regulations about notice and prehearing procedure are the same for petitions and claims. 8 Alaska Administrative Code (AAC) 45.060; 8 AAC 45.065; 8 AAC 45.070 (2004).

14.  8 AAC 45.065 (2004); 8 AAC 45.070(g) (2004).

15.  8 AAC 45.070(g) (2004).

16.  *Dresser*, 702 P.2d at 247.

17.  Elsewhere, the state referred to the finding as settled "law of the case":

> As you pointed out, it was a traumatic injury that was alleged. And, yes, we defended it. It went to the superior court. There is law of the case about what did or didn't happen to Mr. Groom's calf on that day.

18.  *State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 859 (Alaska 2003) (quoting *Patrick v. Sedwick*, 413 P.2d 169, 173–74 (Alaska 1966) and *Alaska Diversified Contractors, Inc. v.*

the board could reconsider the issue—in a modification for example—it could not do so without giving the parties some notice that it was considering doing just that.

The board's letter to Dr. Pitzer, the second-evaluation physician, likewise gives no hint that it was considering revisiting its earlier decision on the slip and fall. The questions the board posed to Dr. Pitzer included the following:

1. Which complaints or symptoms are or are not related to the 03/13/1999 injury and what is the basis for your opinion?

2. Did the 03/13/1999 injury aggravate, accelerate, or combine with a pre-existing condition to produce the need for medical treatment or the disability?

. . . .

4. Based upon the following Alaska Workers' Compensation Act definition, is SCOTT A. GROOM medically stable for any condition attributable to the March 1999 incident?

Although the board's notice may have been nominally defective, if Groom could have adequately presented his case despite the defect in notice, then his right to due process would not have been violated.[19] But Groom has made an adequate showing that he was actually prejudiced by the lack of adequate notice. In the superior court, Groom asserted that had he been given proper notice, he could have called his mother as a live witness again [20] and also could have provided corroborating evidence of the slip and fall.

The state nevertheless asserts that Groom cannot plausibly claim surprise because, according to the state, "[i]t was Groom himself who maintained that he could seek additional benefits based on the March 13, 1999, slip and fall and that his subsequent claims re-

garding snow shoveling, prolonged standing, and vehicle inspections merely amended his earlier claims." Yet the board never made it clear whether it regarded a second set of claims—his shoveling and standing claims— as claims for a separate injury from his original slip-and-fall claim or as an attempt to expand the original claim. When Groom first filed the shoveling and standing claims in late 1999, the board treated the new injury report as distinct from Groom's original slip-and-fall claim and thereafter treated the claims as procedurally distinct until 2002, when it scheduled a single hearing encompassing both claims. Even then, however, the board's prehearing notice appeared to regard the case as involving claims of two separate injuries that were scheduled for a single hearing, rather than a single claim requiring a hearing on two issues.[21] Given the continuing uncertainty as to the procedural status and interrelationship of Groom's original and subsequent claims, we conclude that Groom did not receive clear notice that the 2003 hearing might be regarded by the board as an occasion for revisiting its 1999 decision on his original claim. Because the board provided inadequate notice to Groom that it might reconsider its earlier factual determination that he had slipped and fallen in March 1999, its decision that the slip and fall did not occur must be reversed.

### C. Rebutting the Presumption of Compensability

Groom next argues that the board's 2003 decision must be overturned because the state failed to adequately rebut the presumption of compensability. He argues that the board erroneously fashioned its own medical opinions and ignored the unanimous medical testimony that Groom had suffered work-

---

*Lower Kuskokwim Sch. Dist.,* 778 P.2d 581, 583 (Alaska 1989)).

19. *Matanuska Maid,* 620 P.2d at 193.

20. She testified by telephone at the second hearing.

21. We note that the state did not consistently try to keep the two claims separate in prehearing procedure, either. For example, in a June 22, 2000 prehearing conference on Groom's slip-and-fall claim, the state indicated that it might

want to pursue discovery on the "snow shoveling" activities. Also, in its opposition to Groom's July 2000 affidavit of readiness for hearing on the permanent total disability claim, the state said that it needed to complete discovery about the nature, scope, and physical demands of Groom's work "both generally and in the specific period leading up to the alleged temporary total or permanent total disability period(s)."

related injuries rendering him permanently disabled.

The state responds first by intimating that the medical experts did not unanimously and unambiguously diagnose Groom as permanently and totally disabled. Second, the state claims that it was well within the board's discretion to weigh the competing evidence and make appropriate findings of fact.[22] The state also points to the board's conclusion that Groom misled his doctors.

In addressing these competing arguments, we begin by noting again that the proceedings leading up to the board's final decision in 2003 addressed two distinct injury reports: Groom's original claim for benefits related to his March 13, 1999 slip and fall and his subsequent claims that the continuous shoveling, standing, and performing of his regular duties as a weigh station operator had aggravated his underlying lymphedema. With respect to both sets of claims, Groom asserted that his work-related injuries had resulted in permanent total disability. Although the board joined the claims for purposes of the hearing, it continued to describe them as separate claims.[23]

After conducting the final hearing on those claims, however, the board issued a decision that conflated its procedural analysis of the alleged injuries and claims for benefits. As to both sets of claims, the state had controverted not just the issue of whether Groom's current problem with lymphedema amounted to a permanent disability, but also whether his disability, even if it was permanent and total, stemmed from injuries that were related to Groom's work for the state. The board's 2003 decision completely rejected both sets of claims on a single, overarching theory: that Groom had failed to meet his burden of proving the existence of *any* work-related injury. Yet the board reached this decision through a flawed application of the three-step test used to determine whether a claimant ultimately bears the burden of proof on the issue of work relatedness.

In analyzing this point, the board started by acknowledging that Groom had met the threshold requirement of establishing a preliminary link to activate the presumption that he was permanently and totally disabled. The board then turned to the second step of the analysis, asking whether the state had produced adequate evidence to rebut the presumption of compensability. In conducting this inquiry, the board articulated the following test:

> There are two methods of overcoming the presumption of compensability: (1) presenting affirmative evidence showing that the employee does not suffer permanent and total work-related disability; or (2) eliminating all reasonable possibilities that the employee is permanently totally disabled or that the disability is work-related.

(Citations omitted.)

We assume for purposes of this discussion that this standard might suffice to establish whether the presumption of compensability had been overcome in a case where the existence of a work-related injury was undisputed, and the only contested issue was whether the injury had resulted in the claimant's permanent total disability.[24] But in this case, as already noted, the state insisted that Groom's current problems with lymphedema were not

---

**22.** *Cf. Kodiak Oilfield Haulers v. Adams,* 777 P.2d 1145, 1151 (Alaska 1989) ("The Board may base its decision not only on direct testimony, medical findings, and other tangible evidence, but also on the Board's experience, judgment, observations, unique or peculiar facts of the case, and inferences drawn from all of the above.") (quoting *Fairbanks N. Star Borough v. Rogers & Babler,* 747 P.2d 528, 533–34 (Alaska 1987)).

**23.** The board's regulation concerning joinder provides little guidance about joinder of claims. It provides that when claims are joined, documentary evidence is considered part of the record in each of the joined cases. 8 AAC 45.040(k)(3).

**24.** With regard to the adequacy of the standard articulated by the board, we note that, even in cases involving claims for permanent total disability in which an employer presents evidence suggesting that an injured worker is not completely incapable of returning to some kind of work, the employer bears the additional burden of further showing that "there is regular and continuously available work in the area suited to the employee's capabilities, i.e., that [the employee] is not an odd lot worker." *Leigh v. Seekins Ford,* 136 P.3d 214, 216 (Alaska 2006) (citing *Carlson v. Doyon Universal–Ogden Servs.,* 995 P.2d 224, 227 (Alaska 2000)).

work related even if they might have been permanently and totally disabling.

We have articulated the following standard for determining whether an employer has rebutted the presumption of compensability when a claim for permanent total disability involves a dispute as to both the existence of a work-related injury and whether that injury, if it exists, renders the worker permanently and totally disabled:

> In order to rebut the presumption of compensability, the employer must produce substantial evidence that the injury was not work related. The employer may do this in two ways: by producing substantial evidence that (1) provides an alternative explanation which, if accepted, would exclude work related factors as a substantial cause of the disability; or (2) directly eliminates any reasonable possibility that employment was a factor in causing the disability.[25]

In this case, after the board determined that Groom had triggered the presumption of compensability, the board focused its analysis of whether the state had rebutted that presumption exclusively on whether the state had presented evidence to refute the existence of a permanent total disability. According to the board, Dr. Pitzer's testimony that Groom could "return to employment in positions that do not require significant physical effort or expose the employee to contusion or other physical stresses" sufficed to rebut the presumption.

This finding ended the board's inquiry at the second step of the process and led it to conclude that Groom bore the burden of proving his claims by a preponderance of the evidence. Yet because the board had never inquired whether the state had overcome its burden of rebutting the presumption of compensability with regard to the existence of a work-related injury, the board incorrectly treated Groom as having the burden to prove both the existence of a permanent disability and the work relatedness of his injuries. Conversely stated: Dr. Pitzer's testimony that Groom was capable of returning to work arguably might have sufficed to rebut the presumption that he suffered from a compensable permanent total disability; but his testimony did nothing to rebut the related presumption that Groom suffered from a compensable, work-related partial disability—a presumption the board mistakenly deemed this testimony to have rebutted.

The state nevertheless argues that, despite the board's failure to address the question of work relatedness when it ruled that the state had met its burden of overcoming the presumption of compensability, the board's decision should be affirmed because the testimony of Dr. Szuba in combination with Groom's medical records actually did rebut the presumption on the issue of the work relatedness.[26] Specifically, the board relied on: (1) Dr. Szuba's testimony at the June 2002 hearing that Groom's job would not have aggravated his condition if his work was as described by his co-workers; and (2) Dr. Szuba's statement in his deposition acknowledging that he would change his opinion that Groom's work worsened his condition if Groom's work actually did not involve very much snow shoveling or prolonged standing.

Dr. Szuba's testimony does not rebut the presumption that Groom was permanently and totally disabled as a result of his slip and fall. The evidence that the board relied on in its finding that Groom had not proven his case by a preponderance of the evidence related only to the prolonged standing and general work duties claim. It is unrelated to his claim based on the slip and fall. Thus, it cannot serve as a basis for rebutting the presumption that Groom was permanently

---

25. *DeYonge v. NANA/Marriott*, 1 P.3d 90, 95–96 (Alaska 2000).

26. The state additionally contends that Dr. Pitzer's testimony overcame the presumption of work relatedness by establishing that Groom's condition progressively worsened even in the absence of work stresses and worsened from Groom's lack of self-care. But since Groom's work conditions might have worsened his lymphedema regardless of whether he was adequately self-treating, this testimony could not have ruled out work-related aggravation. Accordingly, only the state's contentions concerning Dr. Szuba's testimony arguably might support an ultimate finding that Groom suffered no work-related injury.

and totally disabled as a result of the slip and fall.

The evidence is also insufficient to rebut the presumption that Groom's other injuries were work related.[27] Dr. Szuba never expressed the opinion that Groom's work was not a substantial factor in causing his disability.[28] The testimony cited by the board establishes that Dr. Szuba's conclusions were contingent on his understanding of Groom's work conditions; if Groom's work requirements were not as Groom described, Dr. Szuba testified that his opinions would have to be revised:

Q: If, in point of fact, Mr. Groom's work did not involve prolonged standing, and did not involve very much snow shoveling, would that change your opinion whether his work worsened his condition?

A: Yes, it would.

It is not at all clear from the deposition transcript what Dr. Szuba understood the questioner's "prolonged" and "very much" terms to mean.[29] Also, only if read in isolation can Dr. Szuba's affirmative response in this exchange be taken to mean that the doctor felt that lighter duties posed absolutely no risk of injury to Groom. Elsewhere Dr. Szuba made it clear that snow shoveling of any frequency could prove injurious:

Q: And would—would the action of standing upright and shoveling snow worsen Mr. Groom's condition regardless of the frequency with which he had to do it?

A: Yes, it would.

The board also noted that Dr. Szuba testified in June 2002 that if Groom's work was as described by his co-workers, then he would find the position acceptable for someone with Groom's condition; but Dr. Szuba qualified this opinion by adding that Groom would also need proper medical garments. Dr. Szuba testified at the same hearing that he still believed that Groom's employment with the state was a substantial factor in bringing about his need for medical treatment and that this opinion was established independently of what Groom told him. He also reaffirmed his opinion that Groom's employment with the state was a substantial factor in bringing about Groom's inability to work.

In short, Dr. Szuba's testimony can at best be described as equivocal or internally inconsistent. In addressing the adequacy of medical evidence offered under analogous circumstances, we have previously held that when the substance of a particular witness's testimony is in doubt, any doubt should be resolved in favor of a workers' compensation claimant.[30] Because of the irreconcilable ambiguity of Dr. Szuba's opinions, any doubt as to their meaning must be resolved in Groom's favor. As a result, they did not provide substantial evidence to rebut the presumption of compensability as to work relatedness in this case.

## D. Statute of Limitations

In its appellate briefing the state argues, as it did below, that whether Groom's snow shoveling and prolonged standing claims were meritorious, they are barred by the Workers' Compensation Act's two-year statute of limitations.[31] Because the board denied Groom's claims on the merits, neither it nor the superior court addressed this issue.

---

**27.** *Safeway, Inc. v. Mackey*, 965 P.2d 22, 27 (Alaska 1998) ("The issue of whether there is substantial evidence to overcome the presumption is a question of law which this court will independently examine.").

**28.** *See Big K Grocery v. Gibson*, 836 P.2d 941, 942 (Alaska 1992).

**29.** At the hearing in June 2002 Dr. Szuba said that he would consider prolonged standing to be more than an hour at a time. He also testified that some lymphedema patients will swell in as little as fifteen minutes. The board made no finding regarding the maximum amount of time Groom was required to stand in performing his work duties.

**30.** *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1048 (Alaska 1978).

**31.** AS 23.30.105, "Time for filing of claims," provides, in relevant part:

(a) The right to compensation for disability under this chapter is barred unless a claim for it is filed within two years after the employee has knowledge of the nature of the employee's disability and its relation to the employment and after disablement. However, the maximum time for filing the claim in any event other than arising out of an occupational disease shall be four years from the date of injury[.] ... It is additionally provided that, in the case of latent defects pertinent to and causing

We have adopted a discovery rule for statute of limitations questions in the workers' compensation context.[32] Under this rule, the limitations period will begin to run on a claim only when a claimant knows: (1) that he has an injury; (2) that his injury is related to his employment; and (3) that his injury has resulted in a disability.[33] Precisely when Groom became aware of his alleged snow shoveling and prolonged standing injuries was not resolved by the board. The record suggests that the discovery might not have occurred until Dr. Szuba submitted his report to the board. Because it is not our role to settle disputed or disputable factual claims,[34] we cannot resolve this issue. On remand, the board remains free to make factual determinations relevant to the statute of limitations issue.[35]

## IV. CONCLUSION

In deciding Groom's claims, the board made two errors that require reversal.

First, it gave no notice to Groom that it might reconsider its earlier factual finding that he had suffered a compensable slip-and-fall injury on March 13, 1999. Due process requires, at a minimum, some notice of what may be decided so that a party has the opportunity to prepare and present his case. Second, the board used an improper legal standard in finding that the state had rebutted the presumption of compensability. We therefore REVERSE the superior court decision affirming the board's decision and REMAND for further proceedings consistent with this opinion.

---

compensable disability, the injured employee has full right to claim as shall be determined by the board, time limitations notwithstanding. (b) Failure to file a claim within the period prescribed in (a) of this section is not a bar to compensation unless objection to the failure is made at the first hearing of the claim in which all parties in interest are given reasonable notice and opportunity to be heard.

**32.** See *Egemo v. Egemo Constr. Co.*, 998 P.2d 434, 441 (Alaska 2000).

**33.** *Id.*

**34.** Cf. *Vaska v. State*, 135 P.3d 1011, 1019 (Alaska 2006):

We recognize of course that an appellate court ordinarily has broad authority to affirm a trial court's ruling on any legal theory established in the appellate record. But this rule is not absolute. By its own terms, it applies only to issues of law that find support in settled facts. It does not extend to new theories that would normally be resolved by discretionary powers traditionally reserved for trial courts—powers relying on case-specific consideration of disputed or disputable issues of fact.
(Footnote omitted.)

**35.** Groom has also argued that the state failed to present labor market survey evidence as ostensibly required by AS 23.30.180(a) and failed to rebut the claim that Groom is merely an odd lot worker; he has suggested that we should impose penalties on the state pursuant to AS 23.30.155(e). Our order of a remand in this case makes it unnecessary to consider these contentions.