*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| UNISEA, INC. and ALASKA NATIONAL INSURANCE COMPANY, | ) ) ) | Supreme Court Nos. S-16851/16861 |
| Appellants and Cross-Appellees, | ) ) ) ) | Alaska Workers' Compensation Appeals Commission No. 16-011 (Consolidated) |
| v. | ) ) | **O P I N I O N** |
| SOFIA MORALES de LOPEZ, | ) ) | No. 7333 – February 8, 2019 |
| Appellee and Cross-Appellant. | ) ) ) ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Constance E. Livsey, Barlow Anderson LLC, Anchorage, for Appellants/Cross-Appellees. Selena Hopkins-Kendall and Eric Croft, The Croft Law Office, Anchorage, for Appellee/Cross-Appellant.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

WINFREE, Justice.

## I. INTRODUCTION

The primary issue in this workers' compensation appeal is the answer to this question: When must an employer pay compensation related to permanent partial impairment ratings if doctors in different medical specialities provide different dates of

medical stability and separate impairment ratings for injuries to different body systems arising out of one work-related accident?

An employer asked medical specialists to evaluate a worker with injuries to different body systems arising out of one work-related accident. The doctors gave two separate opinions, almost a year apart, about final medical stability and relevant permanent impairment ratings in their separate specialities. The employer paid no compensation based on the impairment ratings until almost three months after the second impairment rating. The worker asked the Alaska Workers' Compensation Board to order a penalty for late payment of impairment-related compensation benefits, but the Board agreed with the employer that no impairment-related compensation was payable until the employer obtained a combined impairment rating. The Alaska Workers' Compensation Appeals Commission reversed the Board's decision, concluding that initial impairment-related compensation was payable upon notice of the first impairment rating and further impairment-related compensation was payable upon notice of the second impairment rating.

The employer appeals. For the reasons that follow, we affirm the Commission's decision.

## II. FACTS AND PROCEEDINGS

### A. The Claimant's Injury

In June 2013 Sofia Morales de Lopez, age 54, was employed by Unisea, Inc. as a fish sorter at a Dutch Harbor processing plant. While working she fell about 15 feet from a platform onto a concrete floor and suffered several fractures. After stabilizing in Unalaska, she was medivaced to Anchorage; she received medical treatment there for a few weeks before returning home to California, where she was in a rehabilitation facility for several months. In addition to her orthopedic problems, she developed depression and post-traumatic stress disorder (PTSD) symptoms. Morales's

treating psychiatrist later diagnosed her with PTSD; Unisea's psychiatrist thought she did not meet the full criteria for PTSD.

**B.** **Relevant Statutory Sections And Related Workers' Compensation**

Because this appeal raises issues related to workers' compensation benefits paid under several interrelated statutory sections, we describe the statutory framework here to provide a better understanding of this case's factual development.

**1.** **Temporary total disability compensation**

Temporary total disability (TTD) compensation is payable while a worker temporarily is totally disabled by a work-related injury; *disability* is defined as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury."[1] A worker's TTD eligibility ends at the date of medical stability.[2] *Medical stability* is statutorily defined as

> the date after which further objectively measurable improvement from the effects of the compensable injury is not reasonably expected to result from additional medical care or treatment, notwithstanding the possible need for additional medical care or the possibility of improvement or deterioration resulting from the passage of time.[3]

**2.** **Reemployment benefits**

An injured worker also may be eligible for reemployment benefits, as set out in AS 23.30.041, if a work-related injury results in certain permanent impairments preventing return to the worker's prior employment.[4] The reemployment process is

---

[1] AS 23.30.185, .395(16).

[2] AS 23.30.185.

[3] AS 23.30.395(28).

[4] *See Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 528-29 (Alaska 1993)
(continued...)

intended to provide the injured worker training for alternative remunerative employment.[5] If the injured worker is unable to return to the worker's prior employment for 90 consecutive days, the Reemployment Benefits Administrator[6] is required to evaluate whether the worker is eligible for reemployment benefits.[7] Eligibility requires a doctor's prediction that the injured worker will have "permanent physical capacities that are less than the physical demands" of the worker's job at the time of injury (as described in a specific U.S. Department of Labor reference book) or any other job the worker had in the ten years preceding the injury.[8] An injured worker initially found eligible for reemployment benefits may later be found ineligible if, "at the time of medical stability, no permanent impairment is identified or expected."[9]

In 2005 the legislature created a new and alternative job dislocation benefit for injured workers who qualify for reemployment benefits but who do not want to engage in the reemployment process.[10] The job dislocation benefit is a fixed amount

---

[4]      (...continued)
(holding that injured worker must both be unable to return to former job and have rateable impairment greater than zero to be eligible for reemployment benefits).

[5]      *Arnesen v. Anchorage Refuse, Inc.*, 925 P.2d 661, 665 (Alaska 1996); *see* AS 23.30.041(r)(7) (defining "remunerative employability").

[6]      AS 23.30.041(a) authorizes the Reemployment Benefits Administrator and its staff as part of the Division of Workers' Compensation. AS 23.30.041(a), .395(17).

[7]      AS 23.30.041(c).

[8]      AS 23.30.041(e); *see also Vandenberg v. State, Dep't of Health & Soc. Servs.*, 371 P.3d 602, 606-08 (Alaska 2016) (describing reference used to identify jobs).

[9]      AS 23.30.041(f)(4).

[10]      Ch. 10, § 19, FSSLA 2005; Sen. Labor & Commerce Comm., Section by
(continued...)

based on the worker's permanent partial impairment (PPI) rating; the maximum job dislocation benefit is $13,500.[11] Reemployment benefits, in contrast, include formulation of and payment for an approved reemployment plan[12] along with stipend benefits to the injured worker if other specified benefits, including PPI compensation, end during the plan's implementation.[13] An injured worker found eligible for reemployment benefits must select one of the two options — the job dislocation benefit or the reemployment benefits — within 30 days of the eligibility notification.[14]

### 3. PPI compensation

Alaska Statute 23.30.190 authorizes PPI compensation; subsection (a) provides:

> In case of impairment partial in character but permanent in quality, and not resulting in permanent total disability, the compensation is $177,000 multiplied by the employee's percentage of permanent impairment of the whole person. The percentage of permanent impairment of the whole person is the percentage of impairment to the particular body part, system, or function converted to the percentage of impairment to the whole person as provided under (b) of this section. The compensation is payable in a single lump sum, except as otherwise provided in AS 23.30.041, but the

---

[10] (...continued)
Section Analysis of SB 130 at 9, Alaska Leg. Microfiche Collection No. 11903 (Mar. 3, 2005) (stating that this section "provides a small benefit not previously available to those employees who genuinely desire to retire from the active labor market or to pursue plans of their own without direction from the workers' compensation system").

[11] AS 23.30.041(g)(2).

[12] *See* AS 23.30.041(h)-(j), (*l*).

[13] AS 23.30.041(k).

[14] AS 23.30.041(g).

compensation may not be discounted for any present value considerations.

Alaska Statute 23.30.190(b) requires using a specific medical reference, the American Medical Association Guides to the Evaluation of Permanent Impairment (the Guides), to calculate compensation: "All determinations of the existence and degree of permanent impairment shall be made strictly and solely under the whole person determination as set out in [the Guides], except that an impairment rating may not be rounded to the next five percent." Subsection .190(d) requires the Board to update the Guides as new editions are issued. PPI is *not* linked to medical stability in the statute.

The sixth edition of the Guides was adopted by the Board in January 2008.[15] The Guides has consistently evaluated different organs and body systems separately, using medical testing and examination to estimate the extent a particular organ or body system impairment limits a person's activities of daily living.[16]

An evaluation using the Guides is done when the injured worker reaches maximum medical improvement (MMI), defined as

> [t]he point at which a condition has stabilized and is unlikely to change (improve or worsen) substantially in the next year, with or without treatment. While symptoms and signs of the condition may wax and wane over time, further overall recovery or deterioration is not anticipated. However, both the name given to and exact definition of this status vary

---

[15] Alaska Workers' Comp. Div., Bulletin 08-02 (Jan. 15, 2008), http://labor.state.ak.us/wc/bulletins/08-02.pdf.

[16] AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 2, 5, 21 (6th ed. 2008) [hereinafter GUIDES 6TH ED.].

depending on the jurisdiction. Among the numerous synonyms for MMI are . . . medical stability . . . .[17]

The Guides's MMI definition differs from AS 23.30.395's definition of *medical stability* because the MMI definition centers on a condition's stabilization, not on whether further medical care would lead to objectively measurable further improvement from "the effects of the compensable injury."[18] Because a single work-related injury can affect more than one body system or cause more than one condition, medical stability and MMI may not always be coextensive. And the MMI definition does not indicate that all separate conditions need to have stabilized before any single condition can be evaluated using the Guides.

A rating of an organ or body system under the Guides generally shows how the loss affects the whole person, even though ratings are performed on organs or body systems separately.[19] The Guides also provides a method for combining different body system impairments, set out in both the text and the Combined Values Chart appendix.[20] Essentially the greatest impairment value is combined with the next largest remaining value by looking to where the numbers intersect on a chart.[21] "The method of combining

---

[17] *Id.* at 612.

[18] AS 23.30.395(28).

[19] GUIDES 6TH ED., *supra* note 16, at 21 ("The Guides' impairment ratings reflect the severity of the organ or body system impairment and the resulting *functional limitations of the whole person*." (emphasis in original)). The Guides has regional impairment ratings for a few body systems, *id.*, but these ratings are not at issue here.

[20] *Id.* at 23, 604-06.

[21] *Id.* This method is also used for "[r]elated but separate conditions," but a slightly different rating may be needed when "the impairing condition involves several organ systems." *Id.* at 23.

impairments is based on the idea that a second or a succeeding impairment should apply not to the whole but only to the part that remains after the first and other impairments have been applied."[22] The Combined Values Chart's values are derived from a mathematical formula; using the Chart requires that each organ system's impairment "must first be expressed as a whole person impairment percent."[23]

The Guides sets out a three-step rating process consisting of "clinical evaluation, analysis of the findings, and discussion of how the impairment rating was calculated."[24] According to the Guides, "[t]he first 2 steps must be performed by a licensed physician, and if the clinical findings are fully described, any knowledgeable observer may check the findings against the *Guides*'[s] criteria."[25] The Guides also "emphasize[s]" that "nonphysician evaluators may analyze an impairment evaluation to determine if it was performed in accordance with the *Guides*."[26]

### C. Morales's Claim Process And Administrative Proceedings

The day after Morales's June 2013 injury, Unisea began paying her TTD compensation; it continued to do so through early August 2015, when it controverted the TTD compensation for reasons unrelated to this appeal.

In October 2013 Unisea initiated the reemployment process paperwork, notifying the Reemployment Benefits Administrator that Morales had been totally unable

---

[22] *Id.* at 22-23.

[23] *Id.* at 604.

[24] *Id.* at 28.

[25] *Id.*

[26] *Id.* at 23.

to return to her employment for 45 consecutive days.[27] After Morales remained unable to return to her work for 90 consecutive days, an eligibility evaluation was ordered in California. Reemployment Benefits Administrator staff wrote to Morales, with a copy to Unisea, telling her she was eligible for reemployment benefits and within 30 days she needed to choose whether to go through the reemployment process or receive a job dislocation benefit. Morales had not yet been rated for a permanent impairment, and a rating would have been necessary to calculate the job dislocation benefit.[28] Morales returned the signed and notarized form electing the job dislocation benefit, and Unisea was served a copy of the form in April 2014. At no time did Unisea contest Morales's entitlement to reemployment benefits in general or the job dislocation benefit in particular.

In early November 2014 Morales traveled to Seattle for an employer's medical evaluation (EME) by a panel of three doctors — a neurologist, an orthopedist, and a psychiatrist — all working for the same organization. The psychiatrist gave an opinion that the work injury was the substantial cause of her psychiatric condition, but he did not think her psychiatric condition was medically stable. The other two doctors evaluated Morales's physical condition and determined that her orthopedic problems caused by the accident were medically stable. Using the Guides, they rated her as having a 5% whole person permanent impairment. In February 2015, relying on the orthopedic and neurology EME report, Unisea controverted further medical care for Morales's neck, back, and right foot conditions, as well as any related personal-attendant care. The controversion notice mentioned neither PPI compensation nor the job dislocation benefit.

---

[27]     *See* AS 23.30.041(c) (requiring eligibility for reemployment benefits notice to employee unable to return to original work for 45 consecutive days).

[28]     *See* AS 23.30.041(g)(2).

Unisea continued paying Morales TTD compensation, now based solely on her psychiatric condition.

Morales — representing herself — filed her first workers' compensation claim in June 2015, seeking continued medical care and other benefits. Later that month Unisea filed its first medical summary with the Board, listing the two November 2014 EME reports.[29] Unisea answered Morales's claim, admitting that she was entitled to continued TTD compensation and psychiatric care but denying that she was entitled to continued physical medical care. In early August Morales obtained the counsel who would ultimately represent her before the Board. About the same time, Unisea scheduled a second psychiatric EME, but Morales did not attend. In September Morales filed a compensation claim for continued medical costs, continued TTD compensation (which Unisea had discontinued when Morales did not attend the second psychiatric EME[30]), penalties for Unisea's late payments,[31] interest, and attorney's fees.

Morales attended a second psychiatric EME in November 2015; the EME psychiatrist determined her psychiatric condition was medically stable and rated her as having a resulting 10% impairment. Unisea later communicated with the EME psychiatrist — although the communication itself is not in the record — seeking clarification of the November 2015 rating. In a February 8, 2016 addendum the

---

[29]    A Board regulation requires the parties to file medical summaries only when they file a petition or claim. 8 Alaska Administrative Code (AAC) 45.052(a) (2011).

[30]    The reasons for her nonattendance are discussed in the Commission's decision, but because this issue is not on appeal we omit discussion of it.

[31]    AS 23.30.155(e)-(f) impose a 25% penalty when an employer fails to pay compensation promptly; a penalty is not imposed when an employer files a good faith controversion. *See Harris v. M-K Rivers*, 325 P.3d 510, 517-18 (Alaska 2014) (describing penalty and good faith controversion).

psychiatrist explained that the 10% psychiatric impairment was a whole person rating that, when combined with the 5% orthopedic impairment, would be a 15% whole person impairment rating. On February 17 Unisea then paid Morales a job dislocation benefit and PPI compensation based on the 15% permanent impairment rating.

In March Morales filed a compensation claim for penalty and interest on the PPI payment. She also sought a Board ruling invalidating her job dislocation benefit election because of Unisea's delay in paying her that benefit. Unisea's controversion response covered all of Morales's requests:

> The [employee] signed an Election to Waive Reemployment Benefits and Receive a Job Dislocation Benefit Instead form on 03/03/14. Payment has been issued. . . . No penalty is owed on PPI payments as the [employer] & carrier did not have a completed combined whole body rating until the report . . . dated February 8, 2016 was provided to the carrier.

> The [employee] was not entitled to receive her job dislocation benefit until after she was medically stable & rated for her whole body PPI.

The Board held two hearings and issued three decisions, one on reconsideration, related to Morales's claims. No witnesses testified at either hearing. The first hearing primarily concerned a penalty on Morales's PPI compensation. Unisea relied on a Commission decision, *Lowe's HIW, Inc. v. Anderson*,[32] to argue that it had timely paid PPI compensation, in part because it had continued to pay TTD compensation after receiving the orthopedic impairment rating. Morales contended that *Anderson* did not apply to her case. She argued that Unisea should have paid her lump-sum PPI compensation related to the 5% orthopedic impairment rating within weeks of

---

[32] AWCAC Dec. No. 130 (Mar. 17, 2010) (deciding that employer cannot be ordered to pay TTD and PPI concurrently when employee is in reemployment process), http://labor.state.ak.us/WCcomm/memos-finals/D_130.pdf.

-11- 7333

receiving the EME report and should have paid her the remaining 10% PPI compensation after the November 2015 psychiatric EME report. Unisea maintained that it was justified in waiting until February 2016, when it received the addendum from its EME psychiatrist showing the combined whole person impairment rating.

The Board first decided that no penalty was owed on the PPI compensation payment. The Board reasoned that PPI compensation should be paid in a single lump sum and that Unisea did not have "a true 'whole person' rating" until the February 2016 addendum from the EME psychiatrist. The Board also reasoned that because TTD compensation is "not payable after the date of medical stability" and because Morales was paid TTD compensation from June 24, 2014 through August 7, 2015, Unisea "was not obligated under the Act to issue [Morales] a PPI benefit concurrently with ongoing TTD payments." Morales asked the Board to reconsider its decision; the Board denied reconsideration.

The Board's second hearing considered the job dislocation benefit. Morales sought a ruling from the Board that Unisea's delay in paying the job dislocation benefit made her election invalid, thus freeing her to pursue reemployment benefits. Alternatively she asked the Board to consider a penalty on the job dislocation benefit.

The Board decided there had been no undue delay in paying the job dislocation benefit even though the delay "was unusually long." The Board thought delay in paying job dislocation benefits was common "because of the difference between the statutory requirements for eligibility for reemployment benefits and the calculation of the amount of the dislocation benefit." According to the Board's analysis, job dislocation benefit payment is dependent on a PPI rating that includes all conditions; because the Board earlier had decided that Unisea did not have a complete PPI rating until February 2016, the Board decided the job dislocation benefit was timely paid.

Morales separately appealed the Board's decisions to the Commission; the Commission consolidated the appeals.

The Commission first considered the job dislocation benefit and decided that Unisea had not timely paid that benefit. The Commission looked at the language of AS 23.30.041(g), requiring payment to an employee "who has been given a [PPI] rating by a physician," and decided that Unisea was required to pay Morales at least an initial payment after the first PPI rating by the EME doctors. The Commission indicated its decision was based in part on Unisea's failure to controvert, writing, "Perhaps, more importantly, Unisea never bothered to tell Ms. Morales why it was not paying the dislocation benefit."

The Commission next discussed PPI compensation and decided that Unisea also had not timely paid that compensation. The Commission considered statutory language in the Alaska Workers' Compensation Act, our decisions in *Sumner v. Eagle Nest Hotel*[33] and *Hammer v. City of Fairbanks*,[34] and information in the Guides. The Commission decided that nothing in the Guides requires all body systems or organs to reach MMI at the same time for a final PPI rating. The Commission decided that under our precedent PPI compensation became due when Unisea received the EME reports with the impairment ratings. The Commission distinguished its *Anderson* decision by interpreting it to apply only to claimants actively engaged in the reemployment process. Finally, the Commission agreed with the Board that Morales could not rescind or otherwise avoid the consequence of her election to receive a job dislocation benefit in

---

[33]     894 P.2d 628, 631 (Alaska 1995) (holding lump-sum PPI due within 21 days of receiving rating).

[34]     953 P.2d 500, 505-06 (Alaska 1998) (holding penalty appropriate when employer sought rating clarification from doctor but did not controvert payment).

lieu of reemployment benefits and that Unisea was "not estopped from relying on the Election Waiver by Ms. Morales."

Unisea appeals the Commission's decision about the timeliness of Unisea's PPI compensation and job dislocation benefit payments. Morales cross-appeals the Commission's decision that she cannot avoid her job dislocation benefit election.

## III. STANDARD OF REVIEW

In an appeal from the Commission, we review the Commission's decision and not the Board's.[35] "We apply our independent judgment to questions of law that do not involve agency expertise, including issues of statutory interpretation."[36] "We interpret a statute 'according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose.' "[37]

## IV. DISCUSSION

### A. The Commission Correctly Decided That A Penalty Was Due On Both The Job Dislocation Benefit And PPI Compensation.

In *Harris v. M-K Rivers* we observed that the Act "sets up a system in which payments are made without need of Board intervention unless a dispute arises."[38] An employer is required to pay compensation when it is "due" unless the employer disputes payment, in which case it must file a controversion.[39] If the employer fails to

---

[35] *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1121 (Alaska 2017).

[36] *Vandenberg v. State, Dep't of Health & Soc. Servs.*, 371 P.3d 602, 606 (Alaska 2016).

[37] *Id.* (quoting *Louie v. BP Expl. (Alaska), Inc.*, 327 P.3d 204, 206 (Alaska 2014)).

[38] 325 P.3d 510, 518 (Alaska 2014).

[39] AS 23.30.155(a), (d).

timely pay compensation, it may be subject to a penalty,[40] but an employer who files a good-faith controversion is protected from a penalty.[41] We agree with the Commission that a penalty was appropriate in this case under our previous *Sumner* and *Hammer* decisions.

Not long after the legislature changed the Act's benefit structure from permanent partial disability to permanent partial impairment, we were required in *Sumner* to decide when a lump-sum PPI compensation payment was "due" for determining whether a penalty should be imposed.[42] We agreed with the Board in that case that a PPI compensation payment was "due" within 21 days of the date an employer received notice of a PPI rating.[43] In *Hammer* we later affirmed the Board's imposition of a penalty when the employer delayed paying all PPI compensation while it sought clarification of a rating instead of paying the uncontested PPI compensation and controverting the remainder within 21 days of receiving notice of the initial rating.[44]

Unisea justifies its delay in paying Morales anything until February 2016 by arguing that TTD and PPI compensation cannot be paid concurrently and that a job dislocation benefit is not payable until a final PPI rating. But even if Unisea were correct that TTD and PPI compensation never can be paid concurrently, a penalty nonetheless would be appropriate. Unisea controverted and stopped paying TTD compensation in August 2015, and the Board's later order required Unisea to pay TTD compensation only

---

[40]     AS 23.30.155(e)-(f).

[41]     *Harp v. ARCO Alaska, Inc.*, 831 P.2d 352, 358 (Alaska 1992).

[42]     *Sumner v. Eagle Nest Hotel*, 894 P.2d 628, 631 (Alaska 1995).

[43]     *Id.*

[44]     *Hammer v. City of Fairbanks*, 953 P.2d 500, 505-06 (Alaska 1998).

through November 13, 2015, the date of the second psychiatric EME. If Unisea had, consistent with *Hammer*, promptly paid whatever part of the PPI compensation it did not contest after receiving the November 2015 EME and controverted the remaining PPI compensation, it would not have paid PPI and TTD compensation concurrently.

Unisea also justifies its delay in paying PPI compensation and the job dislocation benefit by arguing that Morales "did not have a true, final, whole person PPI rating" until February 2016. But we faced a similar issue in *Hammer* and approved imposition of a penalty because the employer had knowledge of "the injury resulting in the PPI not later than receipt of the [initial] PPI rating."[45] We said, "To conclude otherwise would permit an employer to conduct an investigation of the PPI rating without controverting, thus thwarting the policy of the Act — to promote prompt payment by the employer to the injured employee."[46]

The facts here are analogous. Unisea's more than two-month delay in getting clarification of the PPI rating from its own doctors is unexplained. Unisea did not contest that Morales was entitled to the job dislocation benefit she elected in 2013 or to PPI compensation. As the Commission correctly observed, Unisea was aware as early as November 2014 that it would need to pay Morales at least a $5,000 job dislocation benefit in addition to PPI compensation. Using Unisea's reasoning — that it did not have to pay or controvert until it got from its own doctors an additional rating or clarification about what those doctors' ratings meant — there is no limit on the amount of time an employer can delay until a payment is due after an initial rating. If Unisea could not get clarification from its doctors within the 21 days following the November 2015 EME, it could have paid Morales the uncontested part of the PPI

---

[45]    *Id.* at 505.

[46]    *Id.* at 505-06.

compensation and job dislocation benefits and filed a controversion of anything remaining.[47] Because Unisea paid Morales nothing within 21 days of either EME report and filed no controversion contesting the ratings, the Commission correctly determined Unisea owed Morales a penalty on the PPI compensation and job dislocation benefit.

B.   **The Commission Did Not Err In Determining That Unisea Should Have Paid The Job Dislocation Benefit Related To The Orthopedic Rating When It Got That Rating.**

Because Morales is entitled to interest on compensation that was not timely paid,[48] we next consider whether the job dislocation benefit should have been paid in part in 2014, when Unisea's orthopedist and neurologist rated Morales as having a 5% whole person impairment due to her lumbar condition, with the remainder paid after her psychiatric condition was rated.

The Commission decided Unisea was obligated to pay at least $5,000 to Morales as a job dislocation benefit in November 2014 after it received the EME orthopedic PPI rating.[49] Unisea contends it had no obligation to pay or controvert the job dislocation benefit until February 2016, after its psychiatrist provided the addendum to his report, because Morales "did not have a true, final, whole person PPI rating" until then. Morales responds that a job dislocation benefit corresponding to a 5% whole person impairment was due in November 2014 because she met the statutory requirements and Unisea knew then that it would owe at least $5,000 in job dislocation benefits, with additional benefits payable later "[i]f and when a higher PPI rating was assessed."

---

[47]   *See id.* at 506-07.

[48]   *Land & Marine Rental Co. v. Rawls*, 686 P.2d 1187, 1192 (Alaska 1984).

[49]   Under AS 23.30.041(g)(2)(A), a job dislocation benefit is $5,000 "if the employee's [PPI] rating is greater than zero and less than 15 percent."

-17-                                                                                            **7333**

Alaska Statute 23.30.041(g)(2) provides that "an employee who elects to accept a job dislocation benefit in place of reemployment benefits and who has been given a [PPI] rating by a physician shall be paid" a sum of money depending on the employee's PPI. The statute thus requires payment when two conditions are met: the employee has elected a job dislocation benefit and "has been given *a* [PPI] rating by a physician."[50] As the Commission observed, the language in AS 23.30.041(g)(2) does not indicate the rating must be a final, combined rating because the subsection uses the indefinite article to indicate when a person qualifies for payment. Morales met both statutory conditions in November 2014, after Unisea's EME doctors had given her a PPI rating for her orthopedic condition. Her job dislocation benefit corresponding to that rating was due at that point, and Unisea needed to pay the benefit or, if Unisea disputed its liability, controvert the benefit.[51]

Unisea has suggested that a valid PPI rating cannot be done before reaching medical stability as defined in AS 23.30.395, but at oral argument before us Unisea agreed that the Act does not specify when PPI is to be rated and acknowledged that in cases involving multiple body systems, different systems may reach MMI at different times. Using the Guides, an injured worker may at different times get valid PPI ratings as different systems reach MMI. Unisea contended at oral argument that requiring it to pay the job dislocation benefit corresponding to the orthopedic impairment before Morales had been rated for the psychiatric condition put it at risk of paying $10,000 — $5,000 for the 5% orthopedic impairment and $5,000 for the 10% psychiatric impairment — rather than the $8,000 it would be required to pay for the combined rating. Morales

---

[50] AS 23.30.041(g)(2) (emphasis added).

[51] *See* AS 23.30.155(a).

-18- 7333

responded that she sought only $8,000, with $5,000 payable after the orthopedic rating and an additional $3,000 payable after the psychiatric rating.

Construing AS 23.30.041(g)(2) together with the Guides shows that Unisea's concern is unfounded. Alaska Statute 23.30.041(g)(2) sets out three payment levels for the job dislocation benefit; each level corresponds to a range of impairment values. The total job dislocation benefit is tied to "the employee's [PPI] rating," indicating that the total due depends on the total impairment rating.[52] Because AS 23.30.190(b) provides that "[a]ll determinations of the existence and degree of permanent impairment shall be made strictly and solely under" the Guides,[53] the orthopedic EME using the Guides and assessing a 5% PPI rating met the statutory conditions for payment. The Guides requires that all subsequent impairment ratings be combined when calculating total impairment and can never exceed 100%.[54] The final combined rating "is always equal to or less than the collective sum of all the impairment values taken individually."[55] Consistent with the Guides's formulation, the total job dislocation benefit should correspond to the total, final rating, meaning that an employer is not at risk of paying extra when it pays the job dislocation benefit as the employee is rated.

Requiring an employer to pay that part of the job dislocation benefit corresponding to the first of what may be several ratings is consistent with *Hammer*, where we held the employer needed to timely pay any benefit it agreed was due and

---

[52]    AS 23.30.041(g)(2)(A)-(C).

[53]    It is undisputed that a PPI rating for purposes of AS 23.30.041(g) is evaluated the same way.

[54]    GUIDES 6TH ED., *supra* note 16, at 21-23.

[55]    *Id.* at 23.

controvert any remaining benefit.[56] Because Morales had elected the job dislocation benefit in 2013, Unisea was required to pay the job dislocation benefit corresponding to her orthopedic impairment rating in November 2014, and it was required to pay any remaining job dislocation benefit after receiving the psychiatric EME rating.

**C.    The Commission Correctly Determined That PPI Compensation Should Have Been Paid Or Controverted After Each EME Rating.**

As with the job dislocation benefit, Morales is entitled to interest on any PPI compensation not timely paid.[57] Unisea's chief argument is that the Commission's decision about part of the PPI compensation being "due" within 21 days of the first EME is contrary to the Act because the Act follows what Larson's treatise describes as "a four-way classification of disabilities,"[58] meaning temporary and permanent benefits should be paid "sequentially and separated by a physician's declaration of medical stability." Unisea maintains that instructions in the Guides "preclude a rating prior to a determination of medical stability (or MMI)" and that a rating using the Guides was "appropriate" only at medical stability. Unisea argues that MMI and medical stability "are in fact the same concept." In Morales's view, MMI and medical stability are distinct but related concepts, with MMI tied to a condition and medical stability related to all of a compensable injury's effects; those effects could include many conditions. She maintains that because different conditions may stabilize at different rates, a condition may be at MMI before a worker is medically stable as defined in the statute. At oral argument before us, Unisea agreed that conditions may reach MMI and be validly *rated*

---

[56]    *Hammer v. City of Fairbanks*, 953 P.2d 500, 505-06 (Alaska 1998).

[57]    *Land & Marine Rental Co. v. Rawls*, 686 P.2d 1187, 1192 (Alaska 1984).

[58]    6 ARTHUR LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 80.03[1] (2018).

at different times, but it contended that PPI compensation needs to be *paid* only after all conditions are rated and a combined impairment calculated under the Guides.

Alaska Statute 23.30.190 is silent about the timing for both rating of and payment for a permanent impairment.[59]  It does not indicate that PPI is tied to *medical stability* as defined in the Act for purposes of either rating or payment.  Alaska Statute 23.30.190(a) requires payment of PPI compensation "in a single lump sum, except as otherwise provided in AS 23.30.041," but it does not indicate that PPI compensation is payable only after medical stability or only after TTD compensation ends.  Alaska Statute 23.30.190(b) provides that "[a]ll determinations of the existence and degree of permanent impairment shall be made strictly and solely" under the Guides.  The Guides permits jurisdictions to define MMI differently than the Guides,[60] but the legislature did not direct that an injured worker be evaluated for a permanent impairment at medical stability.  Instead the legislature required that ratings be done "strictly and solely" under the Guides.[61]

The Guides allows rating at MMI, which is defined in terms of a condition, not in terms of an individual or in reference to all effects of an injury.[62]  Because of the way the Guides is structured, with different body systems rated independently of each

---

[59]  *See Sumner v. Eagle Nest Hotel*, 894 P.2d 628, 631 (Alaska 1995) (observing that "no statutory time frame is clearly specified" for payment of PPI).

[60]  GUIDES 6TH ED., *supra* note 16, at 612 (recognizing that "the name given to and exact definition of [MMI] vary depending on the jurisdiction").

[61]  AS 23.30.190(b).

[62]  *See* GUIDES 6TH ED., *supra* note 16, at 20 (allowing rating only after MMI); *id.* at 612 (defining MMI).  We agree with Morales that *medical stability* as currently defined in AS 23.30.395(28) is different from the MMI definition in the Guides.  As a result, we use the term MMI to discuss the timing of PPI ratings.

other, medical conditions may reach MMI at different times, as Morales's two injury-related conditions did in this case. We have found no specific requirement in the current edition of the Guides that all conditions be at MMI before any condition can be rated. Unisea's doctors obviously interpreted the Guides to permit ratings as each condition reached MMI: the orthopedist and neurologist rated Morales's orthopedic condition the day after the psychiatrist said Morales was not medically stable to rate the psychiatric condition. The psychiatrist did not question the orthopedic rating's validity when Unisea later communicated to him that in November 2014 Morales had been "given a 5% whole person rating for her lumbar spine."

Unisea argues that AS 23.30.190(a), requiring conversion of the "percentage of impairment to the particular body part, system, or function" to the "percentage of impairment to the whole person" as provided in the Guides, mandates only one payment, made after all body systems or organs are medically stable. But nothing in the record here suggests that either EME rating was anything but a whole person impairment rating. As set out earlier, the Guides provides for regional ratings of some body systems; depending on the jurisdiction's law, the regional ratings then are converted into a whole person impairment rating.[63] And the Guides states that its "impairment ratings reflect the severity of the organ or body system impairment and the resulting *functional limitations of the whole person*."[64] We interpret the statutory language as addressing the question of regional ratings, not as directing only one PPI compensation payment when several body systems reach MMI at different times.

Although Unisea looks to Larson's treatise's disability payment classifications for support, Larson's indicates that some jurisdictions have adopted what

---

[63] GUIDES 6TH ED., *supra* note 16, at 21.

[64] *Id.* (emphasis in original).

it calls a "physical-impairment theory" that does not consider wage-earning capacity in awarding permanent partial benefits.[65] The Act awards PPI compensation without consideration of the worker's earning capacity and appears to follow that theory.[66] We considered the 1988 Act amendments, changing the compensation from permanent partial disability to permanent partial impairment, in *Alaska Airlines, Inc. v. Darrow*.[67] Although in *Darrow* we looked at AS 23.30.190's interaction with a different part of the Act, we nonetheless considered section .190's meaning and discussed testimony before the 1988 legislature explaining some differences related to compensation for impairment rather than disability.[68] We observed that "compensation for impairment is awarded independent of earning capacity and for a different type of loss than . . . permanent disability compensation."[69] The same can be said of TTD compensation; TTD compensation is explicitly tied to earning capacity,[70] but PPI compensation is not.[71] A

---

[65]     LARSON, *supra* note 58, at § 80.05[7].

[66]     *See* AS 23.30.190 (tying PPI compensation to degree of impairment rated under Guides); *see also* GUIDES 6TH ED., *supra* note 16, at 5-6 (distinguishing between impairment and disablement and indicating that an "impairment rating is one of several determinants of disablement").

[67]     403 P.3d 1116 (Alaska 2017).

[68]     *Id.* at 1128-30.

[69]     *Id.* at 1130.

[70]     AS 23.30.185 (requiring payment "[i]n case of disability total in character but temporary in quality"); AS 23.30.395(16) (defining *disability* in terms of wage-earning ability).

[71]     AS 23.30.190(a) (setting out PPI formula based on multiplying percent of impairment by a fixed amount).

worker disabled from working may have no rateable PPI.[72] Because PPI and TTD are compensation for different types of loss and because the legislature did not tie PPI rating or compensation to medical stability, nothing distinguishes the date PPI was "due" here from our earlier *Hammer* and *Sumner* decisions. Unisea was required to pay or controvert PPI compensation within 21 days of the November 2014 EME report for the physical condition and within 21 days of the November 2015 report for the psychiatric condition.

There is no indication in the record that Unisea contested its doctors' 5% whole person impairment rating for Morales's physical condition, and because Morales was not at MMI for the psychiatric condition in November 2014, Unisea could not then know whether she would have an impairment related to her psychiatric condition. The Act sets up a system under which compensation is to be paid "promptly, and directly to the person entitled to it, without an award, *except where liability to pay compensation is controverted by the employer*."[73] Unisea has never contested its liability for PPI compensation corresponding to the physical rating, yet it neither controverted nor paid anything related to the physical condition within 21 days of its knowledge of the PPI rating.

Unisea has relied in this litigation on the Commission's decision in *Anderson*, contending that it was justified in not paying PPI related to the physical condition within 21 days of notice of that rating because the Commission said in *Anderson* that until an injured worker "has received a true 'whole person' rating of . . .

---

[72] *See Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 529-30 (Alaska 1993) (holding worker who was unable to return to former work was not eligible for reemployment benefits because she had 0% impairment rating).

[73] AS 23.30.155(a) (emphasis added).

permanent partial impairment, the single lump sum of PPI is not payable."[74]   The Commission distinguished *Anderson* because the claimant in *Anderson* elected to receive reemployment benefits rather than a job dislocation benefit.   We agree with the Commission that *Anderson* can be distinguished from Morales's case.   Alaska Statute 23.30.190(a) explicitly references AS 23.30.041 as changing the timing and method of PPI compensation.[75]   Additionally, *Anderson* predated our *Darrow* decision, and *Darrow*'s interpretation of the Act undercuts the *Anderson* reasoning relied on by Unisea.[76]

Finally, we reject Unisea's argument that because AS 23.30.190(a) says PPI "compensation is payable in a single lump sum, except as otherwise provided in AS 23.30.041," the PPI compensation here could not have been "due" until Unisea had its psychiatrist's combined rating in February 2016.  Under AS 23.30.155(a), the general section about compensation payment, compensation is payable "periodically."   The provision requiring payment of PPI compensation in a single lump sum distinguishes PPI

---

[74]    *Lowe's HIW, Inc. v. Anderson*, AWCAC Dec. No. 130 at 11 (Mar. 17, 2010), http://labor.state.ak.us/WCcomm/memos-finals/D_130.pdf.

[75]    *See* AS 23.30.190(a) ("The [PPI] compensation is payable in a single lump sum, except as otherwise provided in AS 23.30.041 . . . .").  AS 23.30.041(k) requires that PPI compensation be paid at the TTD rate during the reemployment process, with any remaining PPI benefit paid as a lump sum "upon completion or termination" of the reemployment plan; subsection .041(k) also provides for suspension of stipend benefits if PPI benefits have been paid in a lump sum "before the employee requested or was found eligible for reemployment benefits."

[76]    *Compare Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1128-31 (Alaska 2017) (discussing differences between disability and impairment and holding that AS 23.30.180(a) permits offset for permanent partial disability but not PPI after employee became permanently totally disabled), *with Anderson*, AWCAC Dec. No. 130 at 12 (citing potential reduction of permanent total disability by amount of PPI as justification for decision that PPI should not be paid "based on piecemeal ratings").

compensation from other compensation and underscores that PPI compensation is different—paid for impairment rather than disability.[77] As discussed above,[78] in *Sumner* and *Hammer* we decided when PPI compensation was "due." Unisea offers no persuasive argument that PPI compensation here was due at a different time.

Unisea had notice of its doctors' rating of Morales's physical impairment in November 2014; payment for that impairment was due within 21 days, notwithstanding Morales's continued receipt of TTD compensation for her psychiatric condition. Similarly, payment for the second impairment rating was due within 21 days of November 13, 2015, the date of the second EME report. If, after the second EME rating, Unisea needed clarification from its psychiatrist about the second rating or about the combined rating, Unisea was required under *Hammer* to pay whatever part of the PPI rating it did not contest and to controvert the remainder.

**D. The Commission Did Not Err By Refusing To Apply Equitable Principles To Invalidate The Job Dislocation Benefit Selection.**

Morales's cross-appeal asks us to decide whether equitable principles can be used to rescind a job dislocation benefit selection. She compares her election of the job dislocation benefit to a partial settlement and further analogizes it to contract formation. She argues that the long delay in payment of any benefit deprived her of her bargain such that the "contract" should be set aside. She sets out several equitable doctrines that she contends permit her to avoid her job dislocation benefit selection. Unisea counters that the benefit selection represented unilateral action by Morales, not a contract, and that the benefit selection is effective upon service of the signed and

---

[77] *See Darrow*, 403 P.3d at 1126-28 (discussing differences between disability and impairment). Disability is tied to wage loss and inability to work, but impairment is not. *Id.*

[78] *See supra* notes 42-46 and accompanying text.

notarized form on the Division. Unisea argues that the Commission correctly determined estoppel should not apply against Unisea to void the job dislocation selection.

We are not persuaded that Morales's job dislocation benefit selection is analogous to a contract or partial settlement. The job dislocation benefit is a workers' compensation benefit under the Act just like TTD or PPI compensation, not something she bargained for with Unisea. There also is no indication that Unisea in any way was involved in her selection of a job dislocation benefit.[79] Unisea initiated the reemployment eligibility determination by filing a notice that Morales had not worked for 45 consecutive days, but this appears to be the extent of its involvement in the reemployment process. The Reemployment Benefits Administrator supplied Morales the information about the job dislocation benefit, and she returned the form while she was still receiving both TTD compensation and full medical benefits. Equitable principles may apply against the government,[80] but Morales does not seek relief against the State, even though it provided her the information and forms related to the benefits.

The Commission did not explicitly say that equitable principles can never apply when an employee seeks to rescind a job dislocation benefit selection, writing that "Unisea is not estopped from relying on the Election Waiver." It evidently considered equitable estoppel and implied waiver, but it did not find them applicable. But Morales

---

[79] We have recognized the applicability of equitable principles in workers' compensation cases when allegations of fraud or material misrepresentation are present — *see Seybert v. Cominco Alaska Expl.*, 182 P.3d 1079, 1093-97 (Alaska 2008) (material misrepresentation); *Blanas v. Brower Co.*, 938 P.2d 1056, 1060-63 (Alaska 1997) (fraud) — but Morales suggests nothing more than delay in payment.

[80] *See Crum v. Stalnaker*, 936 P.2d 1254, 1257-58 (Alaska 1997) (applying estoppel against agency and requiring it to accept late application).

does not identify any assertion Unisea made[81] and so cannot explain how equitable estoppel should apply here. Ultimately, Unisea's assertion that it could justifiably delay payment until February 2016 was rejected by the Commission in a legal proceeding, and the Commission determined Morales was entitled to a statutory penalty, the legal remedy provided in the Act for late payment. This was the appropriate resolution of the matter.

## V.   CONCLUSION

We AFFIRM the Commission's decision.

---

[81]     The first element of equitable estoppel is assertion by words or conduct. *Schmidt v. Beeson Plumbing & Heating, Inc.*, 869 P.2d 1170, 1175 n.7 (Alaska 1994).