**David L. GROVE, Appellant,**

v.

**ALASKA CONSTRUCTION AND EREC-TORS and CIGNA/ALPAC/INA, Appellees.**

No. S–7324.

Supreme Court of Alaska.

Nov. 14, 1997.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE and BRYNER, JJ.

*OPINION*

COMPTON, Chief Justice.

## I. *INTRODUCTION*

The Alaska Workers' Compensation Board (Board) awarded benefits to David Grove because of a back injury he sustained while working for Alaska Construction & Erectors. The Board denied Grove any medical costs exceeding the statutory standards established in AS 23.30.095(c), or after November 10, 1993, whichever came first. The Board also denied him temporary total disability benefits between November 1992 and January 1993, and after April 1993. The superior court affirmed the Board. Grove appeals. We affirm the superior court.

## II. *FACTS AND PROCEEDINGS*

Grove was employed on a short-term basis with Alaska Construction & Erectors (ACE) in Prudhoe Bay. The job lasted approximately two weeks. Early in the job, Grove was injured lifting steel purlins, which weigh approximately 100 to 200 pounds each. Grove continued on the job after the injury, doing lighter work. The Board concluded that Grove was injured on the job, and that ACE had knowledge of the injury. ACE does not challenge these findings.

In September 1992, after returning from Prudhoe Bay, Grove visited his regular chiropractor, Dr. Jack Moran, three times. The frequency of treatment increased in the following months. In December Dr. Moran referred Grove to physical therapy. Grove received physical therapy from H & W Physical Therapy (H & W) from that December until January 1994.

In December 1992 Dr. Douglas G. Smith, ACE's doctor, evaluated Grove. He determined that Grove's injuries were not related to Grove's employment with ACE. Based on this evaluation, ACE filed a Controversion Notice, disputing that Grove's back injury was work related.

Charles W. Coe, Anchorage, for Appellant.

Constance E. Livsey and Elizabeth D. Goudreau, Faulkner, Banfield, Doogan & Holmes, Anchorage, for Appellees.

Once the Board determined that ACE disputed Grove's condition, it ordered an independent medical exam (IME). Dr. J. Michael James performed this exam in November 1993. Dr. James concluded that Grove had reached medical stability as of April 1993, and that his employment at ACE had caused, at most, a temporary aggravation of pre-existing back pain. Dr. James also concluded that no further treatment was necessary for this injury.

The Board determined that Grove was entitled to compensation. Since Dr. Moran had restricted Grove from any work involving heavy lifting or repeated bending, the Board awarded Grove temporary total disability (TTD) benefits beginning on October 7, 1992, the first day listed for treatment.

Dr. Moran released Grove for work from November 25, 1992, to January 6, 1993. Grove testified that although the work restrictions had been lifted, he was unable to work a full day during that time because of his back pain. Dr. Moran reimposed the work restrictions on January 6.

The Board reinstated TTD benefits from January 1993 until the date when, according to Dr. James, Grove had reached medical stability; i.e., April 1993. The Board also awarded Dr. Moran's and H & W's charges, either according to the statutory frequency standards or as of November 10, 1993, whichever occurred first.

The superior court affirmed the Board. Grove appeals.

## III. *DISCUSSION*

Grove challenges ACE's ability to invoke the statutory treatment limits, the denial of TTD benefits between November 25, 1992 and January 6, 1993, and the denial of TTD and medical benefits after November 10, 1993.

### A. *Standard of Review*

■ When the superior court acts as an intermediate court of appeal under Alaska Appellate Rule 601, we review independently the merits of an administrative determination. *Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992).

■ We review the findings of an administrative agency to determine whether they are supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Miller v. ITT Arctic Servs.,* 577 P.2d 1044, 1046 (Alaska 1978).

■ The Board's interpretation of the statutes regarding frequency standards is a question of law which does not require administrative expertise. In reviewing this issue, we exercise our independent judgment. On questions of law, our duty is to adopt the rule of law which is most persuasive in light of precedent, reason, and policy. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

### B. *Frequency of Treatment*

Alaska law requires a doctor to submit a treatment plan to the employer if treatment exceeds the statutorily-mandated treatment frequencies. Alaska Statute 23.30.095(c) provides in part:

When a claim is made for a course of treatment requiring continuing and multiple treatments of a similar nature, in addition to the notice, the physician or health care provider *shall* furnish a written treatment plan if the course of treatment will require more frequent outpatient visits than the standard treatment frequency[1] for the nature and degree of the injury and the type of treatments. The treatment plan *shall* be furnished to the employee and the employer within 14 days after treatment begins. The treatment plan must include objectives, modalities, frequency of treatments, and reasons for the frequency of treatments. *If the treatment*

---

1. 8 AAC 45.082(f) defines "standard treatment frequency" as follows:

[P]ayment for a course of treatment for the injury may not exceed more than three treatments per week for the first month, two treatments per week for the second and third months, one treatment per week for the fourth and fifth months, and one treatment per month for the sixth through twelfth months.

*plan is not furnished as required under this subsection, neither the employer nor the employee may be required to pay for treatments that exceed the frequency standard.* The board shall adopt regulations establishing standards for frequency of treatment.

(Emphasis added.)

The Board has also adopted exceptions to the standard treatment frequency. These are found in 8 Alaska Administrative Code (AAC) 45.082(g):

The board will, in its discretion, require the employer to pay for treatments that exceed the frequency standards in (f) of this section only if the board finds that (1) the written treatment plan was given to the employer and employee within 14 days after the treatments began; (2) the treatments improved or are likely to improve the employee's conditions; and (3) a preponderance of the medical evidence supports a conclusion that the board's frequency standards are unreasonable considering the nature of the employee's injury.

We reviewed and upheld these regulations in *Chiropractors for Justice v. State,* 895 P.2d 962, 965 (Alaska 1995).

It is undisputed that ACE was not provided with a treatment plan within fourteen days of the treatment. The Board found it did not have the discretion to allow more frequent treatments, because Grove's medical providers had not complied with the statute. Grove argues, however, that ACE may not invoke the statutory treatment limits because it initially denied that Grove was entitled to benefits.[2]

The superior court concluded that Grove's argument was unsupported by the statutory scheme and that he had offered no evidence

of contrary legislative intent. The superior court was correct. Nothing in the statute or the regulations promulgated by the Board supports the contention that frequency standards may be waived when the employer initially disputes benefits. The Board has defined the circumstances under which the frequency standards may be waived. Grove's treatments are not within these circumstances.

Grove relies on *Romualdo Velonza v. Caterair International,* Alaska Workers' Compensation Board Case No. 9218565 (June 9, 1994) to support his argument. The case does not support Grove's argument. In *Caterair,* the Board excused failure to give notice of treatment because of the controversion. However, the Board awarded compensation only for those treatments which fell within the standards established in 8 AAC 45.082(f).[3]

The Board cannot allow more frequent treatment without the submission of a treatment plan following the procedure provided for in 8 AAC 45.082(g). The employer's original decision to controvert the claim is not relevant to the application of the frequency standards. Grove's position, if adopted, would put the burden on the employer to object to the frequency of an employee's medical treatments, if they exceed the statutory standard. The statute is clear that it is the employee's health care provider who must take steps if the statutory frequency of that treatment is exceeded.

Grove argues that the Board erred by failing to find that Dr. Moran and H & W submitted the equivalent of a treatment plan to ACE and its insurers. Dr. Moran submitted "Physician's Reports," which are billing forms prepared by the Department of Labor. H & W also prepared progress reports for

---

**2.** Grove also argues that ACE impliedly authorized the treatments by failing to object to the treatments Dr. Moran was providing. Grove offers no support for the argument that there is any burden on ACE to object to the treatments.

**3.** Grove's brief states that the Board "excused this failure to file notice of treatment, and the employer was found liable for treatments incurred following controversion even though they exceeded the standards." The Board excused

notice in *Caterair* because the employer had controverted the claim and noted that the "employer is liable for those treatments *which were within the frequency of treatments standards* in 8 AAC 45.082(f)." *Caterair* at 7 (emphasis added). The Board specifically held that "the employer is not liable for any treatments which exceed the frequency standards in 8 AAC 45.082(f)." *Caterair* at 8.

Dr. Moran, which were submitted to ACE's insurance carrier. The statute requires that the treatment plan include "objectives, modalities, frequency of treatments, and reasons for the frequency of treatments." AS 23.30.095(c). The Board did not err in determining that the reports do not meet the definition of a treatment plan required by the statute.

### C. TTD Benefits between November 25, 1992 and January 6, 1993

The Board limited Grove's TTD benefits to the period between October 7, 1992, and November 25, 1992, and from January 6, 1993, to April 1, 1993. Temporary total disability benefits are provided for an employee who is totally disabled for a temporary period. AS 23.30.185. Disability is "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." AS 23.30.395(10). The statute creates a presumption of compensability. AS 23.30.120(a).

■ Earning capacity is the "defining characteristic of a compensable disability." *Wien Air Alaska v. Kramer*, 807 P.2d 471, 474 (Alaska 1991). Once an employee is disabled, the law presumes that the employee's disability continues until the employer produces substantial evidence to the contrary. *Bailey v. Litwin Corp.*, 713 P.2d 249, 254 (Alaska 1986). The presumption shifts only the burden of production. *Wien Air Alaska*, 807 P.2d at 474 n. 4. "[O]nce [an] employer rebuts the presumption with substantial evidence, the presumption drops out and the employee must establish each element of [the] claim by a preponderance of the evidence." *Id.*

The Board relied exclusively on Dr. Moran's testimony for suspending TTD benefits from the period from November 25 through January 6. Grove argues that the Board erred in not considering Grove's inability to work during that period, and that ACE must rebut the presumption of a loss of earning capacity by showing Grove could actually work.

Grove cites *Bailey v. Litwin Corp.*, 713 P.2d 249, to support his argument. In that case Bailey returned to work. He later claimed TTD benefits because he was not "medically stable" when he returned to work. The Board denied TTD benefits, based on two doctors' findings that Bailey was able to work. This court found that "medical stability is *not* necessarily the point at which temporary disability ceases." *Id.* at 253. We determined it was not error for the Board to focus on Bailey's employment, rather than on his medical stability. The Board was able to rely on Bailey's actual return to work, although the doctors later restricted him from work. *Id.* at 254. This return to work was sufficient evidence to rebut the presumption of continuing compensability for TTD benefits. *Id.*

In this case, the questions are whether Dr. Moran's testimony was substantial evidence and, if it was, whether Grove established he was unable to work by a preponderance of the evidence. The Board relied on Dr. Moran's determination that Grove was fit to return to work. *Bailey* does not undermine the Board's discretion to rely on this evidence. The only issue is whether Dr. Moran's report is substantial evidence which would shift the burden of production back to Grove to establish, by a preponderance of the evidence, that he could not work during the time his doctor released him for work.

Dr. Moran treated Grove on September 9, 16, and 18. Grove was next treated on October 7. Dr. Moran restricted Grove from heavy lifting on October 13. On November 25 Dr. Moran lifted the restriction. Based on this evidence, the Board determined that Grove was disabled from October 7 through November 24.

Dr. Moran's testimony was that he released Grove to work because Grove wanted to work. He did not specifically indicate that Grove could work or what type of work he might have been able to do.

■ We conclude that Dr. Moran's reports and testimony were substantial evidence. A claimant's own doctor's conclusion that he is medically able to work is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Miller,*

577 P.2d at 1046. It is unlikely that Grove's own doctor would release him for work if he was too severely injured to work, even though Grove wanted to do so.

Because we hold Dr. Moran's reports are substantial evidence, the burden of production had shifted to Grove. ACE did not need to provide proof of Grove's earning capacity. Rather, Grove had to prove by a preponderance of the evidence that he was not able to work. The only evidence offered by Grove to contradict Dr. Moran's reports is his own testimony that he was unable to perform heavy work at the time the work restriction was lifted.

The Board was not required to find that Grove proved by a preponderance of the evidence that he was not able to work. Grove was seeing Dr. Moran regularly. The Board was not required to believe Grove's testimony that he could not actually work, in light of the fact that Dr. Moran could have reimposed the restriction at any time.

### D. *TTD Benefits after April 1993*

Grove cannot receive TTD benefits for any period of disability that occurs after medical stability. AS 23.30.185. The Board's independent medical examiner, Dr. James, concluded that Grove was medically stable by April 1993. Grove argues that he is entitled to TTD benefits from April through June 6, 1993. June 4 is the date Dr. Moran released Grove from the heavy lifting and repeated bending restriction. Grove argues that Dr. James's conclusion was speculative, and that the Board did not rely on any specific evidence demonstrating that Grove did not have a loss of earning capacity.

Dr. James determined that Grove's medical stability coincided with his decrease in chiropractic treatment in April 1993. Grove argues that Dr. James's report is not substantial evidence because it was retrospective. Dr. James did not examine Grove until November 1993. He then determined, based on the examination and medical charts, that Grove was medically stable as of April 1993.

ACE does not respond to Grove's argument that Dr. James's report was retrospective and therefore not substantial evidence. However, Dr. James's report was not the only evidence before the Board which supports its conclusion. Other evidence before the Board included Grove's own testimony that he worked two carpentry jobs, one in the spring of 1993 and the other in May and June, 1993, and that he resumed commercial halibut fishing in July 1993. The Board also considered the report of Dr. Smith, ACE's doctor. The Board's determination is supported by substantial evidence. Therefore, the Board did not err in concluding that Grove was medically stable by April 1993.

### E. *Medical Benefits after November 10, 1993*

The Board determined that Grove was not entitled to benefits after November 10, 1993, because he had reached pre-injury status. The Board also determined that Grove did not need any further treatment as of that date. The Board relied on the report from Dr. James, the Board-appointed independent medical examiner. Dr. James examined Grove on November 10, 1993, and determined that as of April, Grove was medically stable. The Board determined that Dr. James had not concluded that Grove had reached pre-injury status by April. The Board determined that Grove had reached pre-injury status by the time of the examination in November.

Grove objects because the Board relied on Dr. James's report, instead of that of Grove's treating physician, in making this determination. Dr. Moran testified that he believed Grove may not have reached pre-injury status.[4] The physical therapist from H & W testified that as of December 1993, Grove was still making "objective gains."

"[I]f the Board is faced with two or more conflicting medical opinions—each of which constitutes substantial evidence—and

---

4. Dr. Moran testified:

I don't know that he reached [pre-injury status]. He was getting close in approximately a year later, but with all the hassle he was hav-

ing with carriers and everything, he just kind of stayed with the H & W Therapy care and kind of precluded his adjustments.

elects to rely upon one opinion rather than the other, we will affirm the Board's decision." *Yahara v. Construction & Rigging, Inc.*, 851 P.2d 69, 72 (Alaska 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Miller,* 577 P.2d at 1046.

Grove relies on *Black v. Universal Services, Inc.*, 627 P.2d 1073 (Alaska 1981), to argue that Dr. James's report is not substantial evidence. In *Black,* this court found a doctor's testimony was not substantial evidence where the doctor interviewed the claimant for twenty minutes and arrived at a conclusion contrary to that of five other doctors. In this case, Dr. James conducted a more detailed evaluation. The Board also had Dr. Smith's evaluation, conducted a year before Dr. James's, which concluded that Grove did not need any chiropractic treatment after January 2, 1993. We conclude that Dr. James's report is substantial evidence.

## IV. CONCLUSION

Grove has not made a persuasive argument that the frequency standards do not apply where the employer controverts a workers' compensation claim. The plain language of the statute indicates that the health care provider must comply with the treatment frequency standards, absent specific exceptions. Furthermore, the Board's determination of medical and TTD benefits was based on substantial evidence. We AFFIRM the superior court judgment affirming the Board's decision.