*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SILVIA V. TOBAR, | ) | |
| | ) | Supreme Court No. S-17027 |
| Appellant, | ) | |
| | ) | Alaska Workers' Compensation |
| v. | ) | Appeals Commission No. 17-013 |
| | ) | |
| REMINGTON HOLDINGS LP and | ) | O P I N I O N |
| LIBERTY INSURANCE COMPANY, | ) | |
| | ) | No. 7402 – August 30, 2019 |
| Appellees. | ) | |
| | ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Silvia V. Tobar, pro se, Anchorage, Appellant. Rebecca Holdiman Miller, Holmes Weddle & Barcott, P.C., Anchorage, for Appellees.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

A hotel housekeeper injured her back while lifting a pile of linens. Her employer controverted benefits based on an examining doctor's opinion that she was medically stable and that the job injury was no longer the substantial cause of any disability or need for medical treatment. After a hearing, the Alaska Workers'

Compensation Board decided that the woman was medically stable as of the date of the doctor's opinion and therefore not entitled to further disability payments or to benefits for permanent partial impairment. The Board also denied further medical care after the date of medical stability. The Alaska Workers' Compensation Appeals Commission affirmed the Board's decision, and the woman appealed.

Because the Board's selected date of medical stability is not supported by substantial evidence in the record, we vacate the Commission's decision and remand the case to the Commission with instructions to remand the case to the Board for further proceedings.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Silvia Tobar worked for Remington Holdings LP as a housekeeper at the Anchorage Sheraton Hotel. With a fourth-grade education and limited English proficiency, she had worked only in housekeeping since her immigration to the United States.

In late July 2013 Tobar injured her back while lifting bed linens. After a short rest she still had difficulty walking, and an ambulance took her to a hospital emergency room. An MRI showed disc bulging in her lumbar spine; she was taken off work and instructed to follow up with the Alaska Spine Institute.

Tobar's primary provider at the Alaska Spine Institute was Shawna Wilson, a nurse practitioner, who diagnosed discogenic back pain. Wilson initially prescribed medication, referred Tobar to physical therapy, and took her off work for a month. Tobar attended physical therapy in August and September; Wilson then released Tobar to light duty work with restrictions. But Remington had no light duty work for Tobar to do, so she continued to receive disability benefits.

In early October Wilson noted that Tobar felt she was "getting depressed because of her pain levels and her inability to work," and later that month Wilson prescribed an antidepressant. On October 11 Tobar had an epidural steroid injection in her lower back, giving her some pain relief.

Twice that month Wilson answered questions from Remington's workers' compensation insurance carrier. In early October Wilson told the carrier that Tobar had not yet reached maximum medical improvement, and a few weeks later she informed the carrier that she had diagnosed a disc herniation with extrusion at L2-L3, as well as discogenic lower back pain secondary to both the herniation and an L4-L5 annular tear. It was Wilson's opinion that these diagnosed injuries were work-related.

Tobar lost touch with the Alaska Spine Institute for the last three months of 2013; at her deposition she explained she had not understood that she needed to return to physical therapy after the epidural. Wilson did not see Tobar again until January 2014, when she warned Tobar that any improvement in her condition depended on consistent treatment. Wilson prescribed medication, referred Tobar to physical therapy three times a week for four weeks, and took her off work for another month.

In February Wilson again responded to questions from the insurance carrier, informing it that Tobar would again be released to light/sedentary duty work on March 1, 2014. But Wilson was "unable to determine" when Tobar could be released to regular work.

Tobar attended all the prescribed physical therapy sessions in February, reporting to Wilson at the end of the month that her pain had improved. Wilson took Tobar off work for another month, prescribed a second epidural steroid injection — administered on March 13 — and wrote a new prescription for physical therapy. Tobar attended the physical therapy evaluation on March 28; the provider planned one to three sessions per week "for 6-8 weeks for up to 1 hour per session." But Remington

controverted all benefits shortly afterwards, and the physical therapy provider discharged Tobar, explaining, "Unfortunately her workman's comp case has been controverted. Thus we will discharge her from skilled PT."

Remington's controversion was based on a March 20 employer's medical evaluation (EME) by Dr. Scot Youngblood. Dr. Youngblood's EME report shows that he was provided medical records only through October 23, 2013, five months earlier; the insurance carrier's cover letter, dated January 2014, informed him that Tobar's "last visit was October 23, 2013, and she has had no further treatment." Dr. Youngblood learned during the evaluation, however, that Tobar had in fact been receiving further treatment; he wrote that Tobar informed him about the "second epidural steroid injection performed at the Alaska Spine Institute" just seven days earlier; that she had attended physical therapy in February; and "that she is to continue to follow up with the Alaska Spine Institute," where "[a]dditional physical therapy and injections are evidently planned." In his own examination of Tobar, Dr. Youngblood concluded that the July 2013 accident had caused a lower back strain, although he also noted "[p]ain behaviors and symptom magnification." He diagnosed Tobar with degenerative disc disease and said the work injury was not the substantial cause of her low back condition or current need for medical treatment; in his opinion she likely reached medical stability only a few weeks after the accident. Dr. Youngblood also wrote that Tobar had no permanent partial impairment as a result of the injury.

On April 3 Wilson wrote that Tobar could return to work with restrictions on lifting, standing, walking, and bending/squatting. But she also cautioned: "Must attend physical therapy."

At this point there is an approximately one-year gap in Tobar's treatment records. In the spring of 2015 she began seeing providers at Providence Family Medicine Center, obtaining mental health counseling there as well as treatment for her

back. Dr. Kathryn Turner prescribed medications for chronic back pain and also tried osteopathic manipulative therapy in late May 2015, but she then deferred further therapy until Tobar could obtain insurance.

In February 2016, after Tobar had apparently been found eligible for Medicaid and spoken with an attorney about her worker's compensation case, she again saw Dr. Turner, who arranged for an updated MRI. The MRI showed mild spinal stenosis at L1-L2 as well as disc-related problems at L2-L3 and L4-L5. Dr. Turner referred Tobar to physical therapy, which she attended a total of 15 times over the course of two or three months. Tobar also received counseling at Providence Family Medicine Center for depression. She and some of her medical providers observed a connection between her mental state and her pain: she reported that counseling helped with pain relief, and at least one doctor referred her to a psychiatrist specifically because he thought improving her mood would help with the pain.

Dr. Turner and other providers at Providence Family Medicine Center continued to treat Tobar for lower back pain at least through October 2016. Tobar's pain did not significantly improve during that time, however, and in October 2016 she began to see Kimberly Hand, a physician's assistant at Anchorage Fracture & Orthopedic Clinic. Hand believed that some of Tobar's symptoms corresponded to what was shown in her MRI and some did not, and that part of Tobar's problem might be deconditioning.[1] She referred Tobar for physical therapy and massage therapy, and Tobar again attended most of the prescribed sessions. In April 2017 Hand answered "yes" to a question from Remington's attorney asking whether Tobar's symptoms had "remained the same without any improvement for over 45 days."

---

[1]    Deconditioning is "the loss of muscle tone and endurance due to chronic disease, immobility, or loss of function." *Deconditioning*, MILLER-KEANE ENCYC. & DICTIONARY OF MED., NURSING, & ALLIED HEALTH (7th ed. 2003).

Hand referred Tobar to Dr. Jared Kirkham, who performed another epidural steroid injection in February 2017. Dr. Kirkham observed "pain behavior" and additionally noted kinesiophobia as a concern.[2] He did not believe Tobar needed surgery, finding "the structure of [her] spine" to be "actually quite good." He diagnosed chronic low back pain, which he thought might be "myofascial in etiology and certainly perpetuated by [Tobar's] chronic pain syndrome, central pain hypersensitivity, and kinesiophobia." In his opinion, Tobar could return to work "as she tolerates."

Dr. Kirkham arranged a functional capacity evaluation at Tobar's request. The evaluation showed that she was limited in some areas, such as bending, kneeling, and squatting; the evaluation placed her in the "sedentary" physical demands classification.

## B.     Proceedings

In late February 2015 Tobar, through an attorney, filed a written claim seeking temporary total disability benefits from the date of the injury, medical costs, and permanent partial impairment benefits. In its answer Remington admitted temporary total disability only through August 12, 2013, a date consistent with the estimated date of medical stability in Dr. Youngblood's EME report, as well as medical and transportation costs through the date of his report — March 20, 2014 — with some qualifications. Remington denied that Tobar was entitled to any other benefits and raised as an affirmative defense that she had already been overpaid.

---

[2]     Kinesiophobia is an excessive and irrational fear of physical movement "resulting from a feeling of vulnerability due to painful injury or reinjury"; it "is found to be a central factor in the process of pain developing from acute to chronic stages." Caroline Larsson et al., *Kinesiophobia and its Relation to Pain Characteristics and Cognitive Affective Variables in Older Adults with Chronic Pain*, 16 BMC GERIATRICS 128, 128 (July 7, 2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4936054/.

The parties attempted to settle Tobar's claim without success, and the Board held a hearing in June 2017. Tobar's attorney had withdrawn the year before, and the hearing transcript reflects that Tobar represented herself with the assistance of her sister and a Board-supplied interpreter. No witnesses testified, but both Tobar and Dr. Youngblood had been deposed.

Because Tobar's deposition had been taken almost two years earlier, it contained little information about her condition at the time of the hearing. She had testified that she was able to cook on days when she was not in too much pain, that she was generally able to take care of herself, but that it was hard to bend to change her grandchild's diaper. Her deposition testimony gave few details about her medical care other than that she had seen Dr. Turner and been prescribed medication.

Dr. Youngblood's deposition testimony was consistent with his EME report, though he updated some of his opinions after looking at more recent MRIs and medical records. He diagnosed degenerative disc disease. He agreed that Dr. Kirkham's MRI showed disc bulging and herniation, but in his view it was "very difficult" to tell when it happened. He continued to believe the work injury was not the substantial cause of Tobar's medical issues, that any problem from the work injury had quickly resolved, and that Tobar had no resulting permanent impairment.

The Board decided that Tobar was not entitled to benefits after March 20, 2014, the date of Dr. Youngblood's EME report. Its findings of fact summarize medical evidence but do not assign particular weight to any of it; they do not mention Tobar's March 2014 epidural steroid injection or that month's prescription for physical therapy. The Board found Tobar "credible with regard to subjective descriptions of her pain and the events and circumstances of her injury," but it made no other explicit credibility determinations. It rejected Dr. Youngblood's opinion that Tobar was medically stable

in August 2013, writing that "the medical evidence supports [Tobar's] contention that the symptoms continued beyond that [date]."

With regard to temporary total disability benefits, the Board decided that Tobar had attached the presumption of compensability and that Remington had rebutted it. The Board noted that Tobar "suffered from subjective pain not explained by objective findings, and may have been psychologically prone to increased pain perceptions"; it said that "[t]hese facts increase the complexity of the medical facts" such that "expert opinions from medical professionals are needed to address these issues." It then said that (1) no medical opinion after the date of the EME indicated that the disability and need for medical treatment were due to the work injury, and (2) Hand's and Dr. Kirkham's opinions were "generally consistent" with Dr. Youngblood's statements because both of them thought Tobar's pain "was in part psychologically based." The Board concluded, "After the date of Dr. Youngblood's examination, [Tobar] is unable to prove by a preponderance of the evidence that the work injury was the substantial cause of her disability or need for treatment."

Turning to the question of permanent partial impairment, the Board noted that "[m]edical stability is presumed after 45 days without objectively measurable improvement"; that Dr. Youngblood had opined that Tobar "was medically stable two weeks after the work injury"; that Dr. Kirkham had not seen "the need for any further interventional procedures" for Tobar's back; and that nothing in the evidence rebutted the presumption of medical stability. Observing that "[t]he only [permanent partial impairment] rating [Tobar] has received was from Dr. Youngblood, who stated she did not have any permanent impairment related to the injury," the Board concluded that Tobar was not entitled to permanent partial impairment benefits.

On the subject of medical benefits, the Board reiterated its conclusion that Tobar "was medically stable at the time of Dr. Youngblood's examination" and its

mistaken finding that "[n]o physician has recommended additional treatment since that time." The Board found that Tobar had not produced the evidence necessary for a claim for palliative care[3] and determined that no medical benefits were "required for the process of recovery . . . after the date of medical stability."

Tobar appealed to the Commission, still representing herself and supplying her own interpreter at oral argument. She argued that she remained disabled by the work injury; that the Board had not adequately considered Wilson's opinions; and that she had "unanswered questions" after her attorney withdrew and was under the mistaken impression that the Board had more of her records than it did. She disagreed with Dr. Youngblood's diagnosis and disputed Dr. Kirkham's opinion, which she understood as saying that her "pain was for depression."

The Commission affirmed the Board's decision. It determined that Tobar had not met her burden of proof "because the medical evidence to date demonstrates that the work injury resolved without the need for ongoing medical treatment." Citing the statutory definition of medical stability, the Commission agreed with the Board that Tobar had failed to carry her burden of proof on her claim for temporary total disability benefits because there was no clear and convincing evidence that could overcome the presumption of medical stability. The Commission noted what it believed to be Tobar's failure to "seek medical treatment, including physical therapy," for two years following Dr. Youngblood's evaluation, as well as Tobar's report to Hand in January 2017 that

---

[3]        Under AS 23.30.095(o), "an employer is not liable for palliative care after the date of medical stability unless the palliative care is reasonable and necessary (1) to enable the employee to continue in the employee's employment at the time of treatment, (2) to enable the employee to continue to participate in an approved reemployment plan, or (3) to relieve chronic debilitating pain." A claim for palliative care requires "a certification of the attending physician that the palliative care meets the requirements of this subsection." AS 23.30.095(o).

"her lumbar spine symptoms had not changed in the last three years." The Commission concluded that the evidence did not support a claim "for further medical treatment" because no doctor thought Tobar needed surgery or other interventions; Dr. Kirkham's only recommended treatment was for depression, and he "placed no limitations on Ms. Tobar returning to work." The Commission also decided that Tobar had not met her burden of proof for permanent partial impairment, relying, like the Board, on Dr. Youngblood's opinion that her injury had resolved soon after it occurred.

Finally, the Commission observed that Tobar had not provided the Board "with any medical testimony showing a need for medical treatment as a result of the 2013 work injury" and that she was unable to point to any particular medical evidence the Board misunderstood or failed to consider. The Commission affirmed the Board's decision as "supported by substantial evidence in the record as a whole."

Tobar appeals.

## III. STANDARDS OF REVIEW

In an appeal from the Commission, we review the Commission's decision.[4] We independently review the Commission's conclusion that substantial evidence supports the Board's findings of fact by independently reviewing the record and the Board's findings.[5] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[6] "Whether the quantum of evidence

---

[4]     *Humphrey v. Lowe's Home Improvement Warehouse, Inc.*, 337 P.3d 1174, 1178 (Alaska 2014).

[5]     *Id.*

[6]     *Id.* at 1179.

is substantial is a question of law."[7]  "Whether the [B]oard made sufficient findings is a question of law that we review de novo."[8]

## IV.    DISCUSSION

### A.    We Decline To Dismiss Tobar's Appeal.

Tobar argues on appeal that the Board failed to give her the assistance to which she was entitled as a self-represented litigant, primarily by failing to notify her that she could request a second independent medical evaluation (SIME) to help her fill or explain the gaps in the medical records.  Remington argues that Tobar's appeal should be dismissed because she waived all issues, though it acknowledges our "policy against finding unintended waiver of claims in technically defective pleadings filed by pro se litigants."[9]  Remington contends that Tobar failed to raise below the issues discussed in her brief and that the issues she does discuss are not set out in her statement of points on appeal.

We decline to dismiss Tobar's appeal.  We may consider "new arguments or points of error that were neither raised before the trial court nor included in the points on appeal" when "the issue presented is '1) not dependent on any new or controverted facts; 2) [is] closely related to the appellant's trial court arguments; and 3) could have been gleaned from the pleadings, or if failure to address the issue would propagate plain error.' "[10]  We have also concluded that pleadings of self-represented litigants should be

---

[7]     *Id.*

[8]     *Pietro v. Unocal Corp.*, 233 P.3d 604, 611 (Alaska 2010) (alteration in original) (quoting *Leigh v. Seekins Ford*, 136 P.3d 214, 216 (Alaska 2006)).

[9]     *Mitchell v. Mitchell*, 370 P.3d 1070, 1083 (Alaska 2016).

[10]    *O'Callaghan v. State*, 826 P.2d 1132, 1133 n.1 (Alaska 1992) (alteration in original) (quoting *Sea Lion Corp. v. Air Logistics of Alaska, Inc.*, 787 P.2d 109, 115 (continued...)

-11-                                      7402

held to a less stringent standard and that their briefs are to be read generously.[11]  The Commission itself uses this rule.[12]  Tobar, as a self-represented litigant, argued to the Commission that the Board had not fully considered Wilson's opinions.  We conclude that this argument is sufficiently related to the focus of her appeal — the Board's failure to advise her about an SIME — that her SIME argument is preserved for our review.

The Board is authorized under AS 23.30.095(k) to order an SIME "[i]n the event of a medical dispute regarding determinations of causation, medical stability, . . . the amount and efficacy of the continuance of or necessity of treatment, or compensability between the employee's attending physician and the employer's independent medical evaluation."[13]  The date of medical stability was contested in Tobar's case, and Wilson's opinions from 2013 differed from Dr. Youngblood's on the issue.  The Board decided that Tobar had become medically stable in March 2014, making Wilson's disagreement with Dr. Youngblood and her continuing treatment of Tobar in 2014 highly relevant.  Concluding that the Board's slighting of Wilson's opinions and the advisability of an SIME are "closely related" issues for purposes of

---

[10]    (...continued)
(Alaska 1990)).

[11]    *Hymes v. Deramus*, 119 P.3d 963, 965 (Alaska 2005).

[12]    *See, e.g.*, *Khan v. Adams & Assocs.*, AWCAC Dec. No. 57 at 6 (Sept. 27, 2007) ("We read the briefs of pro se litigants generously.").

[13]    The Board's regulation about SIMEs under AS 23.30.095(k) allows the parties to request an SIME, but it also permits the Board to order an SIME on its own motion if it deems an SIME necessary.  8 Alaska Administrative Code (AAC) 45.092(g) (2011).  The Board has raised the need for an SIME on its own even when both parties are represented by counsel.  *Jennings v. Safelite Auto Glass*, AWCB Dec. No. 12-0014 at 2, 12 (Jan. 13, 2012) (raising sua sponte whether medical examination under AS 23.30.110(g) or SIME under .095(k) was needed).

issue preservation, and finding plain errors in important factual findings in the Board's decision — affirmed by the Commission — we also conclude that it "would propagate plain error" if we failed to consider Tobar's appeal in this case.

**B.  The Commission Erred By Concluding That The Board's Decision Was Supported By Substantial Evidence.**

**1.  The importance of the date of medical stability**

Tobar made claims for temporary total disability, permanent partial impairment, and medical benefits.  A worker's eligibility for temporary total disability benefits ends at medical stability.[14]  "Medical stability" is defined by statute as

> the date after which further objectively measurable improvement from the effects of the compensable injury is not reasonably expected to result from additional medical care or treatment, notwithstanding the possible need for additional medical care or the possibility of improvement or deterioration resulting from the passage of time; medical stability shall be presumed in the absence of objectively measurable improvement for a period of 45 days; this presumption may be rebutted by clear and convincing evidence.[15]

Remington conceded in its answer that Tobar was eligible for temporary total disability benefits through what it claimed to be the date of medical stability:  "no later than August 12, 2013, two weeks following the alleged work incident."

Medical stability can also affect a rating of permanent partial impairment. The Alaska Workers' Compensation Act requires that "determinations of the existence and degree" of permanent partial impairment be "made strictly and solely" under the American Medical Association Guides to the Evaluation of Permanent Impairment (the

---

[14]     AS 23.30.185.

[15]     AS 23.30.395(28).

Guides).[16] The Guides uses maximum medical improvement (MMI) as the time when an evaluation of permanent impairment can be done.[17] "The Guides has consistently evaluated different organs and body systems separately, using medical testing and examination to estimate the extent a particular organ or body system impairment limits a person's activities of daily living"; thus an injured worker could reach MMI as to a particular impairment while having not yet reached medical stability.[18] In this case, however, because Tobar claimed disability only due to her back condition, the dates of MMI and medical stability may be the same.

The date of medical stability was not only important, it was also contested. Remington admitted that Tobar suffered at least a temporary disability, arguing that she was medically stable as of August 2013, whereas Tobar, by claiming continuing temporary total disability, contended that she had not yet reached medical stability.

"Once an employee is disabled, the law presumes that the employee's disability continues until the employer produces substantial evidence to the contrary."[19] The Board found substantial evidence to overcome this presumption in "Dr. Youngblood's medical report and testimony opining that [Tobar's] injury was relatively minor, and would have resolved within two weeks." But when the Board considered the next step in its analysis — whether Tobar could prove by a preponderance of the evidence that her disability was continuing — the Board rejected

---

[16] AS 23.30.190(b).

[17] *Unisea, Inc. v. Morales de Lopez*, 435 P.3d 961, 965 (Alaska 2019).

[18] *Id.* ("Because a single work-related injury can affect more than one body system or cause more than one condition, medical stability and MMI may not always be coextensive.").

[19] *Grove v. Alaska Constr. & Erectors*, 948 P.2d 454, 458 (Alaska 1997).

-14-                                                                                    **7402**

Dr. Youngblood's finding of a two-week disability, deciding instead that "the medical evidence supports [Tobar's] contention that the symptoms continued beyond that." There is certainly evidence supporting this finding, including Wilson's October 2013 report in which she told Remington's insurance carrier that Tobar had not yet reached maximum medical improvement and Wilson's further treatment recommendations in January, February, and March 2014.

The date on which the Board settled was the date of Dr. Youngblood's EME, March 20, 2014, after which it decided Tobar was no longer entitled to benefits for temporary total disability. The Commission decided that substantial evidence supported the Board's decision, but it never identified and did not discuss the evidence supporting March 20, 2014 as the date of medical stability.

Ultimately, while the evidence supported the Board's finding that Tobar's disability continued beyond August 2013, the question we need to consider is whether the evidence supported the Board's more specific finding that March 20, 2014, was the date on which she reached medical stability. We consider that question next.

### 2. Evidence related to the date of medical stability

The Commission concluded that Tobar failed to prove by a preponderance of the evidence that her disability continued past the time of Dr. Youngblood's EME, "because the medical evidence to date demonstrates that the work injury resolved without the need for ongoing medical treatment" and because "the evidence is that she has been medically stable for some time." The Commission noted that Tobar returned to Wilson after the EME but that, despite Wilson's referral for physical therapy, "Tobar did not seek medical treatment, including physical therapy[,] for the next two years." But this observation overlooks critical facts. First, the Commission, like the Board, failed to mention the physical therapy provider's explanation why Tobar did not continue with physical therapy in April 2014: "Unfortunately her workman's comp case has been

controverted. Thus we will discharge her from skilled PT." (Notably, Tobar had attended all the prescribed physical therapy sessions in February, after Wilson, in January, had impressed upon her the need for consistent treatment.) Second, the Commission's statement that Tobar "did not seek medical treatment . . . for the next two years" is also clearly erroneous; Tobar's medical records show that a year after the EME she sought treatment for both her back and her mental health at Providence Family Medicine Center, where treatment was again deferred after several months only because of her lack of insurance.

The Commission also found support for medical stability in the records of PA Hand. But nothing in the records indicates that Hand supported a March 2014 date of medical stability. The Commission, like the Board, summarized a January 2017 chart note as indicating that Tobar had told Hand "her lumbar spine symptoms had not changed in the previous three years." The Board did not mention this evidence in its analysis of medical stability, so we cannot say whether the Board relied on it or gave it any weight. Regardless, it is not an accurate summary of the evidence: the chart note relates that Tobar reported to Hand that her pain had improved after the two epidural injections but each time had returned in about three months. The note also reflects that Tobar told Hand that "all of the symptoms that [Tobar] complains of today are the same chronic symptoms that she has had since the beginning of all this." Hand's note appears to show that Tobar had the same symptoms from 2013 to 2017 but their severity came and went depending on her treatment.

The Commission, like the Board, also relied on the fact that Hand checked the "yes" box when asked by Remington's attorney whether Tobar's symptoms had "remained the same without any improvement for over 45 days." But Hand first saw Tobar in late 2016. Hand never identified a specific date of medical stability; her April 2017 statement that Tobar had not improved "for over 45 days" could mean that

Tobar had become medically stable as recently as early 2017 — three years after the Board's selected date.

Remington does not identify any additional evidence that supports a March 2014 date of medical stability. Remington relies on the "general consisten[cy]" in the opinions of Dr. Youngblood, Dr. Kirkham, and PA Hand. Dr. Youngblood's report says that Tobar was medically stable at the time of his EME because she would "likely" have been medically stable two weeks after the injury, but the Board specifically rejected his opinion about a two-week recovery. Dr. Youngblood also testified that he agreed with several of Dr. Kirkham's diagnoses and some of his other observations, but Dr. Kirkham — who first saw Tobar in 2017 — did not offer an opinion about when Tobar became medically stable. And Hand's opinions, as noted above, also came three years after Dr. Youngblood's and did not purport to address the medical stability issue.

Our review of the medical stability finding is impeded by the Board's failure to assign weight to the medical evidence and its apparent oversight of key medical records in addition to those mentioned above.[20] Neither the Board nor the Commission discussed Wilson's October 2013 opinions about causation or maximum medical improvement. Also missing from both decisions' analyses is any reference to Tobar's consistent participation in physical therapy in February 2014, as Wilson prescribed; this would seem to be evidence of Tobar's willingness to engage in the physical therapy Wilson recommended in April 2014, had her finances allowed it. The Board noted that Wilson ordered a second epidural steroid injection, but the Board did not identify when

---

[20] AS 23.30.122 ("The board has the sole power to determine the credibility of a witness. A finding by the board concerning the weight to be accorded a witness's testimony, including medical testimony and reports, is conclusive . . . ."); *see also* AS 23.30.128(b) ("The board's findings regarding the credibility of testimony of a witness before the board are binding on the commission.").

it was ordered or acknowledge that Tobar underwent this procedure on March 13, 2014, just a week before the date the Board selected for medical stability.[21] The Commission said Tobar "was unable to point to any particular medical evidence the Board failed to consider," but Tobar contended that the Board did not adequately consider Wilson's opinions, and this appears to be true.

The Board also failed to mention Wilson's prescription for physical therapy following the second epidural or the note from the physical therapist indicating that Tobar's treatment was discontinued because of Remington's controversion. The Commission thought Tobar's failure to "seek medical treatment, including physical therapy," after the EME was important, but Tobar in fact attended a physical therapy evaluation a week after the EME, was advised at that time to participate one to three times a week for six to eight weeks, but was discharged soon thereafter because of the controversion and her lack of insurance. The Board and the Commission also failed to recognize that Providence Family Medicine Center began treating Tobar for back pain in late April 2015; both the Board and the Commission observed that Tobar went for two years without seeking treatment following the EME in March 2014, but this finding was mistaken.

We have said that "[t]he substantial evidence test is highly deferential, but we still review the entire record to ensure that the evidence *detracting* from the agency's decision is not *dramatically* disproportionate to the evidence supporting it such that we cannot 'conscientiously' find the evidence supporting the decision to be 'substantial.' "[22]

---

[21] Dr. Youngblood's report shows that Tobar informed him of both the second epidural injection and the February physical therapy; his report also mentions Wilson's diagnoses and her opinion of causation.

[22] *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 634 (continued...)

Here we have found no evidence to support the March 2014 date of medical stability selected by the Board. Wilson's opinions contradict Dr. Youngblood's assessments of medical stability, and her prescription of more physical therapy after the second epidural steroid injection implies that Tobar's condition might still have improved with further care. In other words, Wilson's opinions detract from the Board's decision about the date of medical stability, and it is troubling that the Board failed to mention, evaluate, or weigh this countervailing evidence.

In sum, the Board's finding of a March 2014 date of medical stability, affirmed by the Commission, is not supported by substantial evidence. And because the Board and the Commission failed to mention relevant medical evidence — in fact relying on the absence of records for a time when there were records — and neglected to assign weight to the medical evidence it did mention, we must remand this case for further proceedings before the Board.

## C. The Board May Order An SIME On Remand.

Tobar's central argument on appeal is that the Board failed in its duties to her as a self-represented litigant because it did not advise her that she could request an SIME under AS 23.30.095(k). The Act authorizes the Board to order an SIME under both that statute and another, AS 23.30.110(g).[23] Alaska Statute 23.30.095(k) permits an SIME if there is "a medical dispute regarding [a] determination[] of . . . medical stability." Either party may request an SIME under AS 23.30.095(k), or the Board may

---

[22]     (...continued)
n.40 (Alaska 2011) (emphasis in original) (quoting *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 488 (1951)).

[23]     *See* AS 23.30.095(k) (setting out circumstances when "the board may require" an SIME); AS 23.30.110(g) (requiring an employee to submit to a physical examination "which the board may require").

order one on its own motion.[24] The Board and the Commission have interpreted AS 23.30.110(g) as allowing the Board to order an SIME "when there is a significant gap in the medical or scientific evidence and an opinion by an independent medical examiner or other scientific examination will help the board in resolving the issue before it."[25]

As we have discussed, the date of medical stability was both important and disputed in this case, and the date selected by the Board is not supported by substantial evidence. While an SIME is discretionary and not always appropriate, the circumstances of this case appear to favor its use: the claimant does not have a lawyer, she has limited English proficiency, and she apparently failed to call the Board's attention to existing medical records that were important to her case, contributing to the Board's factual errors. We are not ordering that the Board require an SIME on remand, however. Whether to do so remains subject to the Board's discretion.

## V. CONCLUSION

We VACATE the Commission's decision and REMAND the case to the Commission with instructions to remand the case to the Board for further proceedings consistent with this opinion.

---

[24]     8 AAC 45.092.

[25]     *Bah v. Trident Seafoods Corp.*, AWCAC Dec. No. 073 at 5 (Feb. 27, 2008); *see Hulshof v. Spenard Builders Supply*, AWCB Dec. No. 02-0242 at 4-5 (Nov. 26, 2002) (finding that medical records did not clearly establish causation, impairment, or medical stability and deciding that conflicting medical opinions were not needed "to trigger [the Board's] authority (or responsibility)" to appoint an SIME under AS 23.30.110(g)).